317 So.2d 58 (1975)
BLUE CROSS & BLUE SHIELD OF MISSISSIPPI, INC. (formerly Mississippi Hospital & Medical Service)
v.
Mrs. Edna MOSLEY.
No. 48147.
Supreme Court of Mississippi.
August 4, 1975.
McDavid & Rimmer, Jackson, for appellant.
*59 William R. Barnett, Jackson, for appellee.
Before PATTERSON, INZER, and WALKER, JJ.
INZER, Justice.
This is an appeal by Blue Cross & Blue Shield of Mississippi, Inc. from a judgment of the Circuit Court of the First Judicial District of Hinds County awarding appellee Mrs. Edna Mosley $1,408.25 in benefits allegedly due under the terms of a medical insurance contract issued by the appellant.
The insurance contract in question was issued on February 1, 1971, and a major medical endorsement was added to the contract on August 1, 1971. In September 1971 Mrs. Mosley was hospitalized and underwent surgery for which she filed claims for benefits alleged to be due under the policy. Appellant denied liability on the ground that the ailment, disease, or physical condition for which the claims were submitted was contracted prior to the effective date of the policy. Mrs. Mosley then brought this suit.
Appellant admits that the contract was in full force and effect at the time these claims arose, but urges that the disease, ailment or physical condition was contracted, commenced, manifested and actually diagnosed prior to the effective date of the contract, and under the express terms of the contract was not covered thereby. The pertinent provision of the contract reads as follows:
B. NO BENEFITS WILL BE PROVIDED FOR:
1. Any services rendered or supplies provided for, or as the result of, any ailment, disease or physical condition existing at or before the effective date of this contract.
By agreement of the parties this cause was tried before the trial judge without the intervention of the jury. The only witnesses were Mrs. Mosley and the treating physician and surgeon. Mrs. Mosley testified that in 1960 she went to Dr. Blanche Lockard because of excessive bleeding following the birth of her fourth child. After an examination by Dr. Lockard, she was advised that she needed surgery. Because of her financial condition, she said she requested Dr. Lockard to refer her to the University Hospital. There she was examined by doctors whose names she did not remember, who advised her that she did not need surgery.
From that time until August 1971 Mrs. Mosley worked as a waitress, except for time off to have her fifth child in 1961. She said she had no physical difficulty except for occasional excessive bleeding that was more pronounced at times than at others.
During the first part of August 1971, while on vacation, Mrs. Mosley engaged in strenuous activity by working in her garden and painting her house. About the middle of August she experienced heavy bleeding and pain accompanied by "dropping out or falling out feeling" in the lower part of her body. She said she had never experienced this feeling before.
Because of this condition appellant saw Dr. Lockard on September 15, 1971, who after an examination told her she needed an operation. On October 1, 1971, Dr. Lockard performed the operation for which these claims are submitted.
Dr. Lockard, whose specialty is gynecology, testified that she first saw Mrs. Mosley in March 1960 and at that time Mrs. Mosley's chief complaint was excessive vaginal bleeding. At that time she made a gynecological examination that disclosed a prolapse of the pelvic organs, which in layman's terms means a falling down of the bladder, uterus and rectum. The doctor described it as follows:
I described it as a two degree cystourethrocele, which means a falling down of *60 the bladder; a two degree descensus of the uterus, which means a dropping of the uterus; and a two degree rectocele, which means a bulging of the rectum through the posterior wall of the vagina... . The uterus was directed three degrees retrodisplaced. And so I diagnosed her entire condition as prolapsed pelvic organs with hyperemia, which means excessive bleeding.
Dr. Lockard advised Mrs. Mosley that she needed an operation to correct the prolapse. Mrs. Mosley informed her that she was not financially able to pay for the operation. Dr. Lockard then referred her to the University Hospital to have a workup in the gynecology clinic, a D. and C., which means a dilatation and curettage of the uterus, and a possible vaginal hysterectomy with anterior-posterior repair.
Dr. Lockard said she did not see Mrs. Mosley again until September 15, 1971, at which time Mrs. Mosley's chief complaint was a falling out feeling of the pelvic organs, soreness in the lower abdomen, and flooding. Dr. Lockard said she then made an examination of Mrs. Mosley and testified:
On pelvic examination again I noted there was a two degree cystourethrocele, or a falling down of the bladder; a two degree retroflexion and a two degree rectocele, with good perineal support. She had had an infant between these times, her fifth child; and I assume that she had some good perineal support because the repair work of whoever delivered that infant.
She said this condition she found was similar to the condition she found in 1960, but that the condition had grown worse. Dr. Lockard said:
The prolapsed pelvic organs were generally caused from childbirth, where the organs become overdistended. Mrs. Mosley has had five children. After four deliveries in 1960 I found the prolapsed pelvic organs. She had a fifth child after this in that eleven years. I did not deliver it; I did not see her. And the only thing I can tell you is that this is usually a chronic condition that gradually gets worse over the years. As a woman gets older the tissues, I'm sorry to say, will sag; and they will sag more.
After the examination Dr. Lockard again advised Mrs. Mosley that she needed an operation, and on October 1, 1971, she performed the operation that she had first recommended in 1960. It was Dr. Lockard's opinion that the condition which necessitated the operation existed, was active and made manifest prior to February 1, 1971, the effective date of the insurance contract.
From the foregoing testimony, the trial judge was of the opinion that the appellant failed to meet its burden of proof to establish its affirmative defense. It was his opinion that the proof established that the doctors disagreed in March 1960 as to Mrs. Mosley's condition. The difficulty relative to this finding is that there is no proof to support it. Mrs. Mosley testified that the unknown doctors at the University Hospital advised her that she did not need an operation. However, this cannot be construed to mean that the doctors did not find prolapsed organs. They, of course, could have well found the same condition as did Dr. Lockard, but for some reason did not think that the operation was called for at that time.
We are of the opinion that Dr. Lockard's testimony clearly established that the ailment or condition for which the operation was performed existed and was manifest prior to the effective date of the insurance contract. This met the burden of proof required of appellant and the burden then shifted to appellee to refute the testimony that this condition existed prior to the effective date of the contract. Although Mrs. Mosley had seen other doctors after Dr. Lockard saw her in 1960, none were produced to refute the testimony of Dr. Lockard.
*61 This case is rather unique in that both parties agree as to the applicable law. Appellant recognizes that it had the burden of proof to establish its affirmative defense, but urges that the uncontradicted medical testimony clearly established that the ailment or physical condition which necessitated the medical surgery and supplies not only existed and was made manifest prior to the effective date of the contract, but was actually diagnosed by a specialist in this field.
We have held in a number of cases that clauses such as the one in this contract are valid and enforceable, and where, as here, the provisions are not ambiguous, such clauses will be applied as provided by their plain terms. Therefore, the ailment or disease will ordinarily be deemed to exist when a distinct symptom, ailment or condition manifests itself from which a doctor can with reasonable accuracy diagnose the disease; where, as here, the doctor not only found the ailment or physical condition but actually diagnosed it long prior to the effective date of the insurance contract, no recovery can be had. Insurance Company of North America v. Deposit Guaranty National Bank, 258 So.2d 798 (Miss. 1972); Girard Life Insurance Company v. Spain, 232 So.2d 375 (Miss. 1970); Mississippi Hospital & Medical Service v. Lumpkin, 229 So.2d 573 (Miss. 1969); Protective Life Insurance Company v. Broadus, 205 So.2d 925 (Miss. 1968); National American Life Insurance Co. v. Williams, 204 So.2d 174 (Miss. 1967); and Prudence Life Insurance Company v. Cochran, 183 So.2d 830 (Miss. 1966).
It is true that Mrs. Mosley lived with this physical condition and continued to work until her symptoms intensified. The fact remains that the physical condition had manifested itself in 1960 and was then diagnosed. Under the plain terms of the contract, no benefits were payable for services and supplies provided for in the contract as a result of any ailment, disease or physical condition existing at or before the effective date of the contract. Since the testimony is undisputed that this physical condition existed prior to the effective date of the contract, we are constrained to hold that the trial court was manifestly in error in awarding benefits.
For the reasons stated this case must be and is reversed and judgment entered here for appellant.
Reversed and rendered
GILLESPIE. C.J., and RODGERS, P.J., and SMITH, ROBERTSON, SUGG, and BROOM, JJ., concur.