le CORDON BLEU, S.A., Plaintiff,

v.

BPC PUBLISHING LIMITED, Purnell Cookery and Grolier Enterprises, Inc., Defendants.

No. 73 Civ. 2208.

United States District Court, S. D. New York.

March 22, 1978.

Lloyd I. Isler, New York City, for plaintiff; Robert Shapiro, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants; Martin London, Cameron Clark, New York City, of counsel.

## OPINION

### LUMBARD, Circuit Judge: *

The generic term "cordon bleu" is associated the world over with the finest in haute cuisine. Unfortunately, its use has become the focal point of a long and acrimonious battle involving two European cooking schools, both of which seek to benefit in their United States business ventures from the universal regard for cuisine of cordon bleu heritage.

In this diversity action, le Cordon Bleu S.A., a French company, seeks to recover from defendants, BPC Publishing Limited (BPC), an English publishing company, Purnell Cookery (Purnell), a limited partnership in which a subsidiary of BPC is the general partner, and Grolier Enterprises, Inc. (Grolier), a New York company that markets publications through mail order sales, for

* Sitting by designation.

damages suffered when the defendants, allegedly in contravention of their agreement with the plaintiff, either allowed to be published or themselves published and distributed a twenty-volume series of cookbooks entitled "Grand Diplôme Cooking Course." In addition, le Cordon Bleu seeks an injunction against further publication and sales of the offending series, and charges defendants with various forms of unfair competition and unfair trade practices under federal and state law. After considering the evidence presented during the eight days of trial, the court finds that the defendants have not materially breached their agreement and, therefore, that the plaintiff cannot, consistent with its covenant not to sue, claim that the publication of the Grand Diplôme Cooking Course constitutes unfair competition or a deceptive trade practice. Moreover, the court finds that the Paris School has abandoned its trademark "Le Cordon Bleu" for magazines, and accordingly orders the cancellation of the mark.

## FACTS

This dispute originated in March 1971, when Purnell began publication and distribution in the United States of the "Grand Diplôme Cooking Course," a 72-volume partwork[1] issued and sold weekly between March 2, 1971, and July 19, 1972. The Grand Diplôme Cooking Course (the partwork) was an Americanized version of the "Cordon Bleu Cookery Course," a partwork published earlier by BPC and sold from 1968 to 1970 in the United Kingdom, Australia, New Zealand, Canada, and South Africa. It was composed principally of recipes provided by the London Cordon Bleu Cookery School (the London School), a well known cooking school in London, England that was founded in 1945 by Rosemary Hume and Muriel Downes. In addition, the partwork included various general instructions on food preparation and suggested complete menus.

1. "Partwork" is a term used in the publishing industry to refer to a serialized publication in magazine format.

In April 1971, shortly after the partwork came onto the United States market, le Cordon Bleu S.A. (the Paris School) brought suit in the Southern District of New York seeking to enjoin further sales of the partwork.[2] Since 1895 the Paris School has run a cooking school named "l'École du Cordon Bleu" which trains both professional and amateur chefs. Indeed, two of the chefs who received instruction at the Paris School are Downes and Hume, the founders of the London School, who received permission from the Paris School in 1945 to establish an independent school in England under the name "cordon bleu." Through its present owner, Elizabeth Brassart, the school alleged in its 1971 complaint that BPC and Purnell were guilty of various forms of unfair competition, dilution of the Paris School's trade name, and violations of the Lanham Act, 15 U.S.C. § 1125. From the complaint filed in the district court in 1971, and testimony at the trial in the instant case, it is apparent that the Paris School was primarily concerned that the extensive use of "cordon bleu" and "grand diplôme" throughout the partwork would seriously detract from the Paris School's contemplated entry into the United States market with various products. The evidence in the instant case shows, however, that in April 1971 when it brought suit the Paris School had made no use of its trademark in the United States.

On May 25, 1971, after eleven issues of the partwork had been marketed, Judge Weinfeld denied the Paris School's motion for a preliminary injunction staying distribution of the partwork. Shortly thereafter, the Paris School and BPC began discussing the possibility of settling their differences and, following two meetings in September between Brassart and Leslie Pearce, a representative of BPC,[3] the parties directed their New York counsel to pursue the possibility of settlement.

Meanwhile, under an agreement entered into on July 15, 1971, Purnell had licensed to Grolier its English language rights to the partwork, thereby enabling Grolier to publish and sell by mail order a multi-volume, hard cover set of cookbooks referred to in the agreement as the "Grolier Edition." Grolier, in turn, undertook to perform certain market tests to assess the sales potential of the Grolier Edition. Upon completion of these tests, Grolier could, under the terms of its agreement with BPC, exercise an option to market the Grolier Edition.

Although prior to July 15, 1971, BPC did not apprise Grolier (either directly or through Purnell) of the pending litigation with the Paris School, by August Pearce had told Robert Bartner, Grolier's vice president for marketing, of the litigation and the status of the settlement negotiations. Thereafter Grolier was kept informed in general terms of developments in the negotiations with the Paris School. Indeed, beginning in September 1971, Grolier sent proofs for material pertaining to the Grolier Edition through BPC's New York counsel for comments and suggestions in an effort to avoid further antagonizing the Paris School.

After a fruitless meeting among representatives of the Paris School and BPC in New York in September 1971, negotiations lay dormant until January 24, 1972, when Pearce met in New York with counsel for BPC and the Paris School. At that meeting, Pearce offered to pay the Paris School $80,000, half of which was to pay for legal fees of the School, in exchange for the cessation of the litigation and certain other concessions to be made by the Paris School. Soon after the meeting, the Paris School demanded more money and, early in February 1972, Pearce met with Consigny in Paris and made a final offer of $90,000. Within forty-eight hours Consigny called Pearce

2. The Paris School also sought damages in the amount of $2 million and asked for an accounting of all profits from the partwork.

3. At the time of his meeting with Brassart, Pearce was chief executive of the publishing group of the British Printing Corporation, the parent company of BPC. Also present was Pierre Consigny, a French attorney who is currently Director of Housing and Public Works in the French government. Consigny is Brassart's son-in-law.

to accept this offer, and the parties' New York counsel began drafting the terms of an agreement which was to terminate the suit. .

On February 21, 1972, Joseph Ackell, of the firm of Paul, Weiss, Rifkind, Wharton & Garrison, representing BPC, sent a first draft of a settlement agreement to Lloyd Isler, counsel for the Paris School. Isler, finding this version unacceptable, wrote a new draft, which he sent to Ackell on March 6, 1972. After another draft was prepared by BPC's counsel, the attorneys for both sides met on March 15, 1972, and agreed upon a draft, which they approved for signature by their respective clients.

Pearce and Brassart arranged to meet in Paris on April 18, 1972, to sign the document. Prior to their meeting, on April 17 Ackell called William Carpenter, vice president and general counsel of IMC, to suggest four alterations in the final draft of the agreement. Carpenter, who had been present at some early settlement discussions and who had been kept informed throughout of developments in negotiations, considered these proposals and then accepted them on behalf of his client, the Paris School; Ackell confirmed their talk by letter dated April 17, 1972. Thereafter, the modifications were forwarded to Pearce in London by telephone, who had the relevant portions of the agreement retyped prior to his trip to Paris.

On April 18, Pearce went to Paris and met with Brassart and Consigny, taking with him copies of the agreement for signature. After reading the documents, Brassart and Consigny discussed between them the various provisions. Thereafter, Consigny proposed a slight alteration to paragraph 10 of the agreement, Pearce agreed, the change was written in by attorneys representing the Paris School, and the agreement was signed. Following the signing, Pearce sent the agreement to New York, and counsel for the Paris School, BPC, and IMC signed it. On April 25, 1972, pursuant to the agreement, Judge Bonsal of the Southern District of New York signed an order dismissing the Paris School's action against BPC.

Throughout the negotiations between the Paris School and BPC, Grolier had conducted marketing tests to determine the commercial feasibility of the proposed Grolier Edition. As part of these tests, Grolier mailed out various brochures advertising the Grolier Edition of the Grand Diplôme Cooking Course, offering for sale prototype issues. Shortly after being notified of the terms of BPC's settlement with the Paris School, Grolier sought and obtained a three month extension of its May 1972 deadline for the exercise of its option on the Grolier Edition, apparently in order to allow an evaluation of the results of marketing tests. Finally, on July 28, 1972, Grolier exercised its option to go forward and sent BPC an advance against royalties. Meanwhile, BPC, concerned about possible infractions by Grolier of BPC's recent agreement with the Paris School, attempted to persuade Grolier to agree that Grolier would become directly bound by the terms of the April 18 agreement. In December 1972, having refused to enter into such an agreement, Grolier agreed as an alternative to clear all material through BPC's counsel prior to its dissemination. Contemporaneously, the first edition of the Grolier Edition, entitled "Grand Diplôme Cooking Course," began to be marketed.

On January 15, 1973, Carpenter, as representative for the Paris School, wrote Grolier and BPC complaining that the Grolier Edition violated the April 18 agreement, and demanding an immediate end to its publication. After a fruitless exchange of correspondence, the Paris School, on May 14, 1973, initiated this action in the Southern District of New York. The plaintiff moved for a preliminary injunction shortly thereafter, seeking a stay of any further publication of the Grolier Edition. Judge Duffy denied this motion on July 17, 1972, finding that the plaintiff had failed to show a sufficient probability of success on the merits. On January 11, 1974, the Court of Appeals for the Second Circuit affirmed from the bench Judge Duffy's denial of an injunction.

*DISCUSSION*

Plaintiff asserts that defendants have breached the April 1972 settlement agreement in three respects. First, the Paris School argues that the Grolier Edition is merely a republication of the partwork—albeit in different form—and that the settlement agreement absolutely proscribed any such republication. Second, plaintiff contends that the settlement agreement implicitly forbids defendants to use the title "Grand Diplôme Cooking Course" on any publication. Last, plaintiff asserts that the settlement agreement strictly limits the defendants' right to use "cordon bleu" (even in referring to the London School) and that both the Grolier Edition and the advertising therefor exceed these limitations. None of these contentions survive careful scrutiny.

As the plaintiff concedes in its post-trial brief, the settlement agreement does not explicitly prohibit republication of the partwork. Nonetheless, the Paris School argues that the "plain object" of the agreement was to preclude such republication—including by issuance of subsequent editions.[4]

▮ Since the court finds that the Grolier Edition is not a mere republication of the partwork, it is unnecessary to reach the question whether such republication was implicitly forbidden by the settlement agreement. A close examination of the two works reveals substantial differences between the Grolier Edition and the partwork. Their formats are entirely different: Whereas the partwork is a magazine-like publication that came out weekly, each issue containing fewer than twenty pages, the Grolier Edition consists of twenty bound volumes, each containing about 150 pages. Robert Clarke, president of Grolier, testified that, in order to adapt the editorial content of the partwork to meet Grolier's requirements, Grolier, aided by BPC, developed additional material to be interspersed throughout the Grolier Edition. Thus, the Grolier Edition is roughly twice the length of the entire partwork. Moreover, Grolier extensively repositioned and generally altered the editorial content of the partwork before incorporating it in the Grolier Edition. Plaintiff has repeatedly conceded (both before and during trial) that the settlement agreement in no way prohibits BPC's use of the editorial content of the partwork in subsequent publications; indeed, plaintiff could not assert otherwise, since the agreement does not in any way—implicitly or explicitly—restrict BPC's rights concerning use of the editorial contents of the partwork.

Plaintiff's assertion that the settlement agreement prohibits BPC's use or licensing of the title "Grand Diplôme Cooking Course" is without merit. Paragraph 6 of the agreement provides in relevant part:

Plaintiff [the Paris School] acknowledges the exclusive right of BPC and Purnell to use of the registered trademark "Grand Diplôme" and covenants and agrees that it will not undertake or cause to be undertaken any steps or procedures in contest of . . . [that] right . . . and further covenants not to sue defendants [BPC and Purnell] or their licensees with respect to any publication under the name "Grand Diplôme" which conforms to the restrictions set forth in paragraph 3(b) with regard to the partwork.

This provision unambiguously allows BPC and its licensees to use "Grand Diplôme" in titles of future publications, provided other constraints included within the agreement are observed.

Notwithstanding the plain language of paragraph 6 of the settlement agreement plaintiff asserts that the use of the words "cooking course" together with "grand diplôme" somehow transformed an explicitly permitted action into a breach of the settlement agreement. The courts finds no support for this contention. The agreement itself contains no restrictions on BPC's right to use "Grand Diplôme" for any pur-

4. Specifically, plaintiff points to paragraph 2 of the agreement, which provides for the destruction of all but 500 copies of each issue of the partwork within 60 days of the issue's distribution, and to the evolution of paragraph 7 of the agreement, which refers to "subsequent" editions of certain BPC publications, but does not do so with respect to the partwork.

pose. Indeed, the language of paragraph 6 is so broad that the plaintiff requested, and was granted, a provision allowing the Paris School to continue issuing its "grand diplôme"—a diploma awarded graduates of the school. Moreover, the bargaining between the parties prior to the April 1972 signing of the accord gives no indication that any prohibition of "grand diplôme cooking course" was ever considered, much less agreed to.[5] Finally, if the plaintiff's interpretation of the settlement agreement were correct, all issues of the partwork marketed after April 18, 1972, would have violated the agreement, since each was entitled "Grand Diplôme Cooking Course." The fact that the Paris School never objected to any of these issues further confirms the plain import of the wording of the agreement: BPC was to have totally unfettered use of "grand diplôme"—whether used in connection with "cooking course" or otherwise. Thus, BPC acted entirely within the settlement agreement when it allowed Grolier to publish the Grolier Edition under the title "Grand Diplôme Cooking Course."

Plaintiff's assertions regarding allegedly improper use of "cordon bleu" in the Grolier Edition and in advertising for the Grolier Edition are somewhat more troubling. The Paris School argues that the settlement agreement allows the words "cordon bleu" to be used in BPC publications (or publications licensed by BPC) only in referring to the London School, that such references to the London School can appear only five times in any one publication, and that each of the references must be placed on the inside front cover of the publication. Moreover, plaintiff argues that this restriction on use of "cordon bleu" applied to advertisements for the BPC publication, as well as to the publication itself.

■ The court turns first to the wording of the agreement, which the Paris School claims not to be binding on it because of the allegedly surreptitious insertion of language in paragraph 10. Paragraph 10 of the agreement, which deals explicitly with subsequent BPC publications and advertising therefor, as drafted by attorneys for the parties on March 15, 1972, reads in pertinent part:

> Nor will [BPC or Purnell] utilize the words "Cordon Bleu" in connection with any publications or advertising materials in the United States or France except to the extent herein permitted.

Following Ackell's "cosmetic" changes proposed to Carpenter on April 17, 1972, this passage read:

> Nor will [BPC or Purnell] utilize the words "Cordon Bleu" in connection with any publications other than the partwork or advertising materials in the countries listed below except to the extent herein permitted with reference to the partwork. (footnote omitted)

Finally, after Consigny and the Paris School's French counsel had altered paragraph 10 once again, the agreement was signed on April 18, 1972. In its final form, paragraph 10 reads:

> Nor will [BPC or Purnell] utilize the words "Cordon Bleu" in connection with the partwork or any other publications or advertising materials in the countries listed below except to the extent herein permitted with reference to the partwork. (footnote omitted)

The court finds that paragraph 10 as it appears in the document signed on April 18 was understood by the parties and accurately states their agreement. Ackell considered the changes he proposed on April 17 to be trivial, save insofar as they more accurately portrayed the agreement between the parties. Carpenter, a representative of the plaintiff and an attorney with extensive experience in both litigation and

---

5. Despite some evidence at trial to the contrary, the court finds that no representative from the Paris School ever explicitly stated to representatives of BPC that the agreement being reduced to writing would prohibit future BPC publications under the title "Grand Diplôme Cooking Course." In any event the unambiguous language of the agreement governs. See *West, Weir & Bartel, Inc. v. Mary Carter Paint Co.*, 25 N.Y.2d 535, 540, 307 N.Y. S.2d 449, 452, 255 N.E.2d 709, 711–12 (1969).

negotiation, concurred in Ackell's assessment, after scrutinizing the alterations.[6]

Moreover, when, immediately prior to the signing, Consigny and another attorney meticulously reviewed the agreement—and paragraph 10 in particular—they raised no question except concerning their own proposal for a change in paragraph 10. Thus, the tacit acceptance of everyone who reviewed the Ackell modification of April 17, 1972, confirms BPC's assertion that the change was not meant to and did not materially alter the meaning of paragraph 10.

Furthermore, even if the Ackell modification materially altered the agreement, the Paris School agreed to paragraph 10 as modified. Consigny, who demonstrated in court his full command of the English language, is an attorney of some stature in his county; as a former Inspector of Finance in the French Ministry of Finance and financial adviser to the French Minister of Foreign Affairs, he certainly is not unsophisticated in business matters. In addition to Consigny, Axel Baum, a member of the New York law firm of Hughes, Hubbard & Reed, represented the Paris School at the April 18 signing. Before the agreement was signed, both attorneys examined paragraph 10, and Consigny discussed it at length with Brassart. Under these circumstances, the court concludes that Brassart signed the agreement fully realizing its import and believing that its wording represented the agreement she had reached with Pearce of BPC. Thus, the Paris School is bound by the terms of the agreement as signed.

According to paragraph 10, BPC may use the words "cordon bleu" in subsequent publications and advertising to the extent the agreement permitted such use in the partwork. Paragraph 3(b)(iii), in discussing restrictions on the partwork, states that the words "Cordon Bleu" shall not appear

. . . in the inside or contents of the partwork except when referring to an established recipe . . . or when referring to the institution known as the "London Cordon Bleu School" or the "Cordon Bleu Cookery School of London," to which reference shall be made no more than five times on the inside cover of the partwork in any one issue.

Unfortunately, this provision is equally susceptible of two very different meanings. On the one hand, it may mean that the London School could be referred to an unlimited number of times throughout the text of the partwork, but that its name could appear no more than five times on the inside front cover of any issue. On the other hand, paragraph 3(b)(iii) may mean that the London School's name could be placed only five times in any issue of the partwork, and that each of these five appearances had to be on the inside front cover of the issue. Thus, paragraph 3(b)(iii) is ambiguous and the court must look to other evidence to ascertain its meaning. *See West, Weir & Bartel, Inc. v. Mary Carter Plant Co.*, 25 N.Y.2d 535, 540, 307 N.Y.S.2d 449, 452, 255 N.E.2d 709, 711–12 (1969).[7]

From the extrinsic evidence on this point, the court concludes that the parties meant to restrict references to the London School

6. Carpenter, as one of the attorneys acting on behalf of the Paris School, was familiar with the negotiations between the parties. Indeed, when Ackell suggested other changes be made to the agreement on March 24, 1972, he did so by writing both Isler and Carpenter. One week later, these changes were consented to by Carpenter, acting for the Paris School. Following this, Ackell again approached Carpenter on April 17, 1972, to discuss last minute cosmetic changes.

7. Paragraph 13 of the settlement agreement provides that any dispute arising under the

agreement "shall be governed by the law of the State of New York."

Although all of the parties argued that the settlement agreement unambiguously supports their respective positions, they anticipated the possibility that the court would not agree, and so each introduced considerable parol and documentary evidence concerning the negotiations between BPC and the Paris School. As the court finds paragraph 3(b)(iii) ambiguous, it has considered all of this external evidence concerning the import of the settlement agreement.

only when they appeared on the inside front cover of the partwork. When Brassart first proposed to Pearce, at their meeting on September 22, 1971, an embargo on BPC's use of the London School's name, Pearce categorically rejected the possibility and declared the issue nonnegotiable; the Paris School, accepting Pearce's statement, did not again make such a suggestion.

At their February 12, 1972, meeting in Paris, Pearce and Consigny discussed limiting BPC's use of "cordon bleu" to references to the London School; apparently Pearce did not object to this approach. Thus, in Ackell's first draft of the agreement, which was sent to Isler on February 21, 1972, subparagraph 2(c) provided that, "BPC and Purnell shall use the term 'Cordon Bleu' only when stating the full name of the London School or when referring to an established recipe . . . ." Isler, in his responding draft, proposed a stricter limitation on use of "cordon bleu" by including a provision (his paragraph 3(c)(iii)) that would have limited the number of times "cordon bleu" could be used by BPC in referring to the London School. Even in this draft, however, no mention was made of limiting BPC's references to the London School to the inside cover of the partwork.

At the March 8, 1972, meeting of counsel Isler explained that his paragraph 3(c)(iii) had been included to protect the Paris School against BPC's saturating the inside of the partwork with "cordon bleu" by repeatedly referring to the London School. After Ackell rejected this analysis, counsel compromised, agreeing to a limitation only on usage of the London School's name on the inside front cover of the partwork. Apparently because prospective buyers of partworks look first to an issue's inside front cover to ascertain the nature and origin of the publication, Isler agreed to this approach which is embodied in paragraph 3(b)(iii) in the final draft of the agreement.

Thus, the history of discussions preliminary to the signing of the agreement conclusively demonstrates that the parties intended by paragraph 3(b)(iii) to limit BPC's use of the London School's name only on the inside front cover of the partwork; no restriction whatsoever was placed on such use elsewhere in the partwork.[8] Under paragraph 10 of the agreement, as applied to future publications by BPC, this means that "cordon bleu" may appear without limitation anywhere other than on the inside front cover of the publication, so long as it is used only in referring to the London School or to an established recipe.

The London School's name does not appear on the inside front cover of the Grolier Edition,[9] and all uses of "cordon bleu" in the Grolier Edition are either in naming the London School or in referring to an established recipe. The court finds, therefore, that the Grolier Edition does not violate the provisions of paragraphs 3(b)(iii) and 10 of the settlement agreement.

■ Moreover, the great preponderance of the mail advertising done for the Grolier Edition used "cordon bleu" only as permitted under paragraph 3(b)(iii). One mailing, however, included three references to "the cordon bleu way" and a single reference to "the cordon bleu manner." At trial, the president of Grolier testified that, of the approximately eight million pieces printed with these minor infractions, only six million were mailed. The remaining two million pieces were destroyed at BPC's expense (about $60,000), after its attorneys discover-

---

8. The conduct of the parties immediately after the settlement agreement was signed further supports this interpretation of the accord. In the penultimate issue of the partwork, which was otherwise modified to conform to the agreement, reference is made to the "London Cordon Bleu Cookery School" in the middle of the issue; yet the Paris School at the time made no objection to what it now claims was a plain breach of the new agreement.

9. The Grolier Edition, as do most hardcover publications, has no printing whatsoever on the inside front cover of any of its issues. It is plausible to suppose that the parties meant the paragraph 3(b)(iii) restriction in use of "cordon bleu" to pertain to the title page of hardcover publications. Even assuming this to be the case, however, the Grolier Edition does not violate the accord.

ed the oversight and requested Grolier to alter its use of "cordon bleu" in advertising. The six million pieces represented roughly only two percent of a total of three hundred million pieces Grolier prepared for test advertising of the Grolier Edition.

Nonetheless, by this breach of the contract, BPC's compliance was made "less than full and exact" and therefore nominal damages of $1 must be awarded.[10] See *Jacobs & Young v. Kent,* 230 N.Y. 239, 129 N.E. 889 (1921) (Cardozo, J.); 3A A. Corbin, Corbin on Contracts § 702, at 316 (1960).

The court finds that, as BPC's breach was unimportant and unintentional, the Paris School was not thereby relieved of its obligations under its covenant not to sue.[11] It is well established that where, as here, the non-performance of one party to a contract is innocent, does not thwart the purpose of the bargain, and is wholly dwarfed by that party's performance, then the breaching party has substantially performed its obligations. In such a case, the non-breaching party is not excused from its responsibilities under the contract. See *Jacobs & Young v. Kent,* 230 N.Y. 239, 129 N.E. 889; 3A A. Corbin, Corbin on Contracts §§ 700–707 (1960); 10 New York Jurisprudence, *Contracts* §§ 324–31 (1960).

Thus is the instant case plaintiff's claims under 15 U.S.C. § 1125 for false designation, under New York General Business Law § 368–d for dilution of the Paris School's trademark, and for common law unfair competition must be dismissed as precluded by plaintiff's covenant not to sue. At the same time, however, BPC is not entitled to recover from the Paris School BPC's litigation expenses resulting from this suit, since the court finds that plaintiff has not acted in bad faith or in obvious

breach of its covenant not to sue. *See Artvale, Inc. v. Rugby Fabrics Corp.,* 363 F.2d 1002, 1008 (2d Cir. 1966).

Grolier counterclaims against the Paris School asking that the court cancel two of the Paris School's registered trademarks under 15 U.S.C. § 1064(c). Plaintiff currently has registered with the United States Patent Office the trademark "Le Cordon Bleu" for magazines "relating to culinary, gastronomic, and oenolgic [sic] matters" (No. 786,420), and the trademark "Le Cordon Bleu" for educational services, "namely, courses and lectures in cooking and oenology" (No. 786,557).[12] The court finds no reason to cancel the educational services trademark; the magazine mark, however, must be cancelled because the Paris School has abandoned it.

Grolier's claim that plaintiff has abandoned its educational services trademark is entirely without merit. Since 1969 Richard Grausman, acting on behalf of the Paris School, has given over twenty cooking courses to a total of nearly 5,000 students in New York, Cincinnati, Denver, Washington, D.C., San Francisco, Cleveland, and Detroit. The advertising and publicity for these four week courses invariably included numerous references to "Le Cordon Bleu." The court finds that such use of the Paris School's trademark has not been so "sporadic, casual or transitory" as would warrant cancellation under the abandonment clause of 15 U.S.C. § 1064(c). *See La Societe Anonyme des Parfums Legalion v. Jean Patou, Inc.,* 495 F.2d 1265, 1271–72 (2d Cir. 1974); *D.M. & Antique Import Corp. v. Royal Saxe Corp.,* 311 F.Supp. 1261 (S.D.N.Y.1970).

The situation is entirely different, however, with respect to the Paris School's trademark for magazines. Save for the

---

10. The court sees no reason to hold Grolier liable for nominal damages, as Grolier was not a party to the agreement, did not sign it, and was apprised only in general terms of the ongoing settlement negotiations.

11. Paragraph 7 of the April 18, 1972, settlement agreement provides:
    [the Paris School] covenants not to sue defendants [BPC or Purnell] or their licensees

with respect to any publication under the name "Grand Diplome" which conforms to the restrictions set forth in paragraph 3(b) with regard to the partwork.

12. The Paris School has a third trademark, "Le Cordon Bleu de Paris," for educational services (No. 954,227). Grolier has withdrawn its original challenge to this trademark.

collections of recipes distributed by Grausman to his students as part of their cooking course, plaintiff has sold no publication under its trademark in the United States. The court finds that these pamphlets, which consist of sixteen pages of 8½" × 6" spiral-bound paper,[13] can in no way be characterized as "magazines"; they were not issued periodically, they have no editorial content whatsoever, and they were not offered for sale to the general public. Accordingly, since the Paris School has not used its trademark for magazines, the court orders that the trademark be cancelled under 15 U.S.C. § 1064(c).[14]

In sum, the court finds that defendants BPC and Purnell violated their agreement only in a minute respect and, accordingly, defendants must pay nominal damages of $1 to plaintiff. All plaintiff's other claims against defendants are barred by plaintiff's covenant not to sue contained in the settlement agreement. In addition, the court orders plaintiff's trademark for magazines cancelled under 15 U.S.C. § 1064(c). Defendants' other counterclaims are dismissed. No costs to any party.

The parties are to submit a proposed judgment on three days' notice.

This opinion constitutes the court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52.

---

**13.** The pamphlets' format changed for a brief time in 1970 when the word "magazine" was added to the covers and the page size was increased to 8½" × 12"; the content remained basically the same, however. Apparently this was an attempt to make the recipe pamphlets more closely resemble magazines. See note 14, infra.

**14.** As an additional ground for cancellation of the trademark, the court finds that the Paris School's magazine trademark was obtained through fraud. 15 U.S.C. § 1058 requires that applicants for trademarks, in order to obtain the full twenty year term for their mark, must file six years after initial application with the Patent Office an affidavit demonstrating continued use. In November 1970 Brassart filed such an affidavit with the Patent Office in which she asserted that the school continued to use its trademark on magazines. Attached to her affidavit, Brassart included a copy of the cover from one of Grausman's recipe collections.

As the court has found that these collections of recipes are not magazines, Brassart's affidavit was materially false. Moreover, the court finds that Brassart made the materially false representation to the Patent Office knowing it to be false. See *Schwinn Bicycle Co. v. Murray Ohio Manufacturing Co.*, 339 F.Supp. 973, 983 (M.D.Tenn.1971); *Bart Schwartz International Textiles, Ltd. v. F T C*, 289 F.2d 665, 669, 48 C.C.P.A. 933 (1961). Brassart admitted at trial that she knew of no magazine being published by the Paris School after 1962. Further, evidence at trial showed that the Paris School purposely altered Grausman's recipe collections to include the word "magazine" on their front cover in an attempt to mislead the Patent Office. Such an obvious subterfuge constitutes fraud under 15 U.S.C. § 1064(c). See *Timely Products Corp. v. Arron*, 523 F.2d 288, 298 (2d Cir. 1975).

Lastly, the court finds that the fraud perpetrated on the Patent Office by the Paris School was in the "obtaining" of the trademark. As part of the procedure for securing a trademark for the twenty year period provided by statute, applicants must file affidavits of continuing use. This supplemental filing is as routine and as necessary to the obtaining of a registration as is the initial filing. Accordingly, the court finds that when an applicant fraudulently represents continued use under 15 U.S.C. § 1058 and thereby secures his mark for twenty years, the mark has been obtained fraudulently within the meaning of 15 U.S.C. § 1064(c). But see *Morehouse Manufacturing Corp. v. J. Strickland & Co.*, 407 F.2d 881, 887, 56 C.C.P.A. 946 (1969) (semble).

At one point in this litigation, Grolier also asserted that plaintiff's marks should be cancelled because they have become generic. In its post-trial briefs Grolier no longer presses the point, and so the court will not address it. The court notes, however, that "cordon bleu" is generally recognized as referring to excellence in haute cuisine and the preparation thereof and is universally defined in dictionaries without reference to any particular school.