**A & S LITHO, INC., Plaintiff,**

v.

**RITE MACHINERY CORP. and Daniel Crognale, Defendants.**

No. 84 Civ. 8680 (EW).

United States District Court, S.D. New York.

Jan. 13, 1986.

Paul P. Mathews, Paramus, N.J., for plaintiff.

Robert C. Damm, Cliffside Park, N.J., for defendants; Lynne Van Voorhis, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This action was tried to the Court, following which, based upon the trial testimony, the parties submitted proposed findings of fact and conclusions of law, as well as post-trial memoranda. Upon a study of the foregoing, the Court's word-by-word reading of the entire trial transcript, and its contemporaneously made trial notes which contain an appraisal of the demeanor of the witnesses as they testified, the Court finds that plaintiff has failed to sustain its burden of proof as to any of its various claims, and that defendants have sustained their burden of proof upon their counterclaim in the sum of $225,000, and are entitled to judgment accordingly.

Plaintiff A & S Litho (A & S) was in 1984, and had been for a number of years prior thereto, engaged in the printing business. Anthony Suppa ("Suppa") was its President and principal stockholder. In the operation of its business, plaintiff used a two-color Aurelia printing press (the "Aurelia") of which it was the lessee, and upon which, at the time of the events at issue in this case, it owed the lessor a balance of $40,000.

Defendant Rite Machinery Corporation ("Rite") is a New Jersey corporation engaged in the business of reconstructing printing presses, including Harris four-color presses. Defendant Daniel Crognale ("Crognale"), its chief executive and principal stockholder, had assisted plaintiff in acquiring and financing the Aurelia.

Plaintiff was interested in purchasing a four-color Harris press, the subject of this action. On March 2, 1984, following a period of negotiation, an agreement was entered into whereby plaintiff agreed to purchase from Rite a rebuilt Harris four-color press for the sum of $250,000. The agreement was evidenced by a written purchase order which provided, among other matters, that the purchase price was to be paid when the press began commercial operation, and that the seller was to provide a six-months' parts and labor warranty.

Plaintiff contends that the parties also agreed that, upon installation of the Harris four-color press in its premises, defendants would remove the Aurelia press to sell to a third party on plaintiff's behalf for the sum of $40,000, and would promptly remit to plaintiff the proceeds of such sale. Plaintiff further contends that such sale and remittance was a prerequisite to the purchase of and payment for the Harris four-color press; that the defendants knew that plaintiff intended to use the proceeds from the sale of the Aurelia to pay the outstanding balance to the Aurelia's lessor; and that plaintiff was to get the $40,000 before plaintiff paid for the four-color press. In effect, plaintiff claims that the parties entered into two separate and independent contracts, one for the sale of the Aurelia by defendants on the plaintiff's behalf, and one for the purchase of the Harris. Plaintiff charges defendants with the conversion of the monies realized from the sale of the Aurelia pursuant to the alleged oral agreement; no writing evidencing its terms exists or was offered upon the trial.

Defendants' version of the transaction is different. They contend that they agreed to accept the proceeds from the sale of the Aurelia, if any, as a credit against the

purchase price of the Harris; that the Aurelia was sold for $40,000 in September 1984; that they credited plaintiff $40,000 less $15,000 expenses of sale; and that they are thus entitled upon their counterclaim to the sum of $225,000: the $250,000 purchase price of the Harris as provided for in the written purchase order less the $25,000 credit from the sale of the Aurelia.

As to the second agreement, for the purchase of the Harris four-color press, plaintiff asserts other claims for breach of contract and warranty, alleging that the Harris press was not properly rebuilt; that it was not commercially acceptable in that from the time it was first print-tested all four units of the press showed excessive streaking, which appeared on solid and print patterns, as well as other defects and deficiencies; and that although Rite attempted to correct this and other technical problems, it failed to do so.

■ The Harris press was installed by the defendants at plaintiff's premises on June 20, 1984, at which time the Aurelia was removed. It took several weeks for Rite's employees to set up and assemble the Harris press for functional operation. The operation of the press required pressmen familiar with this type of machinery, and while plaintiff obtained the services of one such experienced pressman some weeks after installation, it appears from the testimony that two experienced operators were necessary for proper operation of the press. After installation was complete, adjustments were required, and in response to plaintiff's requests these were timely made by defendants' experienced employees. Some of the problems which Rite was called upon to remedy were clearly due to the fact that plaintiff had over an extended period failed to engage an experienced four-color pressman. In any event, whenever plaintiff complained, Rite corrected the alleged deficiencies and performed its

warranty obligation under the contract. The adjustments made were generally of the sort required on a "shakedown cruise." The evidence fully warrants a finding that the primary purpose of the contract was fulfilled; that the alleged breaches claimed by the plaintiff are trivial; and that defendants substantially performed their obligations as required by the contract.[1]

Moreover, the proof establishes not only that the claimed deficiencies in performance were minor, but that the plaintiff put the press into commercial use in the filling of customer orders, and that in the several instances where price allowances were made to customers for "streaking," the allowances were minor and the product was accepted by plaintiff's customers.

■ The testimony of plaintiff's expert, who examined the machine in March 1985, five months after the events surrounding plaintiff's claim of trespass, discussed below, is not entitled to credence. There is a complete absence of proof that when examined by the expert in March 1985 the Harris press was in the same condition as at the beginning of November 1984, the last date on which defendants had access to the machine. The evidence also warrants a finding that there is a certain irreducible minimum amount of streaking on all Harris color presses, and whether a machine functions adequately for commercial use is determined by what is "tolerable or what is intolerable" for the customer.[2] According to defendants, the machine was tested prior to its removal to plaintiff's premises, and again upon its installation there, and on each occasion was found to be capable of commercially acceptable production.[3] Upon all the evidence, the Court finds that Rite Machinery performed under its warranty, and that the press was properly rebuilt and functioned appropriately for its intended commercial use and purpose.

**1.** Cf. *Anderson, Clayton & Co. v. Alanthus Corp.*, 91 A.D.2d 985, 457 N.Y.S.2d 578 (2d Dept.1983); *Jacob & Youngs v. Kent*, 230 N.Y. 239, 129 N.E. 889 (1921) (Cardozo, J.); *Le Cordon Bleu, S.A. v. BPC Publ. Ltd.*, 451 F.Supp. 63, 71 (S.D.N.Y. 1978).

**2.** Tr. at 113 (testimony of Joseph Sahagian, plaintiff's pressman).

**3.** Tr. at 172–74 (testimony of Daniel Crognale).

Accordingly, defendant Rite Machinery is entitled to judgment in its favor upon its counterclaim for the sum of $250,000, the agreed-upon purchase price of the Harris press, which plaintiff was obligated to pay under the terms of the purchase order upon installation and start of commercial production, which the Court finds upon all the evidence occurred not later than August 30, 1984. The amount owing on the purchase order is reduced by the credit in plaintiff's favor of $25,000, the net proceeds derived from the sale of the Aurelia press.

Plaintiff asserts one other claim. The effective operation of the four-color press was apparently beyond the capacity of plaintiff and plaintiff's employees. Normal adjustments of the press for production operation presented problems with which plaintiff's employees were unable to cope, and so Suppa decided to give up the ghost.[4] Shortly before Election Day 1984, Suppa requested that Crognale and Rite remove the Harris; Suppa testified that he told Crognale that if Crognale paid him the $40,000 for the Aurelia, less $6,000 rigging costs incurred in the delivery of the Harris, the parties would be even, and that Crognale agreed.[5] Crognale denies that such an agreement was made. He contends that he told Suppa that Rite was entitled to immediate payment because the Harris was being used for commercial production, offered to extend warranty coverage for one more month at Rite's cost, and left A & S's shop.[6]

Immediately after this conversation, Crognale testified, he instructed employees of Rite to enter plaintiff's facility for the purpose of rendering the Harris press inoperable.[7] Defendants' representatives had received keys to A & S's print shop in connection with the installation of the Harris four-color press, and also had access to the premises through an adjoining plant which they had permission to use. On Election Day, November 6, 1984, defendants' employees entered plaintiff's premises and dismantled the controls of the Harris press so that it could not be operated.[8] Crognale testified that he ordered this done because he believed the Harris was being damaged by improper use and absence of maintenance.[9] In addition to dismantling the four-color Harris, defendants' employees also removed parts from two other machines, a 36-inch single-color Harris and a 36-inch two color Harris, which were not involved in the controversy at issue in this case. Crognale testified that these other two machines were rendered inoperable at his instructions, because plaintiff was behind on lease payments owed to the lessor of the two presses, Daniels Leasing Co., a leasing firm in which Crognale was the principal stockholder, and because Crognale believed that these machines also were not being properly maintained.[10] Plaintiff claims that defendants' conduct in entering the premises and disabling the two leased machines amounted to trespass, and seeks compensatory and punitive damages.

■ Plaintiff's trespass claim fails for two reasons. In the first place, defendants' employees did not enter the premises at A & S by force or without permission: they had been provided with keys at an earlier time, and in addition had access through the adjoining print shop, a fact of which plaintiff was aware.

■ More importantly, the agreement under which plaintiff leased the two 36-inch Harris presses specifically provided that:

In the event of default, Lessor may at its option ... without demand or legal process and without being guilty of trespass or conversion ... enter into the premises where the equipment may be found and take possession of same and remove same, whereupon all rights of Lessee in

---

4. Tr. at 24–25.

5. Tr. at 35–36.

6. Tr. at 189 (testimony of Daniel Crognale).

7. Tr. at 184.

8. Tr. at 147 (deposition testimony of Daniel Crognale); *id.* at 185 (trial testimony of Daniel Crognale).

9. Tr. at 185.

10. Tr. at 183–84.

such equipment shall terminate absolutely.[11]

Suppa conceded that the last made a monthly lease payment on these two machines in June 1984, five months before the defendants took the action of which plaintiff complains.[12] Plaintiff was therefore clearly in default under the provisions of the lease, and defendants' entry upon the premises was a remedy to which Daniels Leasing or its agent was entitled by express reservation in the lease agreement.

Accordingly, the Court finds that the plaintiff has failed to sustain its burden of proof as to any of its claims, and that defendants are entitled to judgment in the sum of $225,000 on their counterclaim.

Submit order.

---

11. Defendants' Exhibit J, at para. 11.

12. Tr. at 90.