## SAN JUAN PRODUCTS, INC., Plaintiff–Appellant,

v.

## SAN JUAN POOLS OF KANSAS, INC., a/k/a Free Spirit Pools, Inc.; and Dwight H. Lien, Individually, Defendants–Appellees.

## SAN JUAN POOLS OF KANSAS, INC., Plaintiff–Appellee,

v.

## SAN JUAN POOLS OF KANSAS, INC., a/k/a Free Spirit Pools, Inc., and Dwight H. Lien, Individually, Defendants–Appellants.

Nos. 85–2413, 86–1258 and 85–2500.

United States Court of Appeals,
Tenth Circuit.

June 13, 1988.

James T. Capretz of Capretz & Kasdan, Irvine, Cal., and Edward L. Brown, Jr., Wichita, Kan. (Alan V. Thaler of Capretz & Kasdan, Irvine, Cal., with them on the briefs), for plaintiff-appellant San Juan Products, Inc.

Alvin D. Herrington of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., Wichita, Kan. (Michael E. Howell, St. Anne, Mo., with him on the brief), for defendants-appellees San Juan Pools of Kansas, Inc. and Dwight H. Lien.

Before SEYMOUR, McWILLIAMS and MOORE, Circuit Judges.

JOHN P. MOORE, Circuit Judge.

This case was filed by San Juan Products, Inc. (San Juan), to vindicate the invasion of its alleged proprietary rights protected by common law and federal trademarks against the defendants, San Juan Pools of Kansas, Inc., and Dwight H. Lien (Lien collectively). In denying all claims and counterclaims, the United States District Court for the District of Kansas characterized the action as a "provocative matter" and awarded defendants all of their attorney fees and costs. Consequently, the parties filed separate appeals in which San Juan challenged the district court's resolution of the merits and award of attorney fees, and Lien questioned the district court's disposition of San Juan's registered trademark. In addition, Lien now requests

attorney fees and expenses in connection with this appeal and remand of the matter under Fed.R.App.P. 38 for an appropriate determination. Although we conclude the SAN JUAN trademark was not fraudulently procured, this finding does not affect the core of the action in which we are satisfied the district court did not err in its finding of facts and application of law. Neither was there an abuse of discretion in its award of attorney fees. Nevertheless, San Juan's appeal is not so vexatious, frivolous, or groundless as to trigger scrutiny under Fed.R.App.P. 38.

## I. Background

San Juan manufactures, markets, and licenses dealers to manufacture and install a one-piece fiberglass swimming pool. The source of the design and creation was a Seattle, Washington, corporation founded by Robert and Mary Ann Stark in 1958. In 1968, the Starks entered into a partnership agreement with Ervin D. Parent and Edgar G. Harman, assigning all right, title, and interest in their invention and the SAN JUAN mark in the United States and all foreign countries but retaining the same rights exclusively in Washington, Oregon, and the Canadian Provinces of British Columbia and Alberta. In a 1970 settlement agreement, the Starks relinquished their interests in San Juan but retained their exclusive right to manufacture and sell pools in Washington and Oregon.

In 1969, on behalf of San Juan, Erv Parent filed an application with the United States Patent and Trademark Office (PTO) to register the trademark SAN JUAN, representing that "no other person, firm, corporation, or association has the right to use said mark in commerce" in the United States. The mark, No. 888,124, was officially registered on March 24, 1970. Eight months later, Erv Parent and Edgar Harman signed a redemption agreement which granted Harman the exclusive right to use the mark SAN JUAN in New Mexico and Colorado in return for Harman's shares in San Juan. Subsequently, Harman marketed and sold SAN JUAN pools in Colorado, Montana, Wyoming, South Dakota, Nebraska, New Mexico, and Kansas.

Two years later, Harman furnished the 16' × 34' SAN JUAN mold to William Barnhart in Albuquerque, New Mexico. Using this mold, Barnhart became a dealer for Harman. Barnhart's company, San Juan Pools of Albuquerque, operated independently of San Juan, and marketed SAN JUAN pools in Nebraska, Oklahoma, Utah, Texas, and Wyoming.

On April 8, 1975, Erv Parent signed another agreement with a Florida corporation, SUN N' SURF (SUN), granting SUN exclusive marketing rights in San Juan's installing dealer program in an "unlimited" territory, excepting only Colorado, New Mexico, Oregon, Washington, British Columbia, and Alberta, Canada. Two years later, this agreement was extended to continue SUN's exclusive marketing rights in Kansas.

In the meantime in 1976, Erv Parent filed an affidavit of continuous use with the PTO to maintain his federal trademark registration. On May 1, 1977, notwithstanding the SUN agreement, San Juan and Lien signed a one-year dealer license agreement in which San Juan appointed Lien the "exclusive dealer" of San Juan products in the "entire State of Kansas."

Prior to the 1977 expiration of the Lien–San Juan license, Parent notified Lien of his dissatisfaction with the number of pools Lien sold. Because of this dissatisfaction, Parent decreased Lien's sales territory and offered to extend the one-year license on a month-to-month basis. Lien's attorney responded with a counteroffer demanding Parent furnish materials and information due but not provided under the original agreement and extend the license another year with the same territory.

Instead of an answer from Parent, with whom Lien had dealt, Lien received a mailgram from San Juan Pools–Waterway (Waterway), a subsidiary of SUN. The mailgram informed Lien that Waterway had the exclusive rights to the State of Kansas, and for $19,000 payable to Waterway, Lien could extend its dealer license. Since San Juan never responded to Lien's counteroffer, and the mailgram appeared to termi-

nate the Lien–San Juan license agreement, Lien proceeded to purchase and sell pools as an independent dealer eventually developing its own mold from which it manufactured a one-piece fiberglass pool.

In 1979, new management of San Juan, recognizing the randomness of the existing territorial licensing, decided to regain control of this watered-down network. Early in 1980, President Sullivan and Vice–President Lohman became aware of Lien's purported license agreement with San Juan and travelled to Wichita to renegotiate an agreement with Lien. Their site visit revealed that Lien was manufacturing a pool Mr. Lohman claimed was "splashed"[1] from the San Juan design.

In 1981, San Juan filed this suit alleging Lien's splashing the SAN JUAN pool infringed its common law and federal trademarks as a form of unfair competition under 15 U.S.C. § 1125(a) and demanding injunctive relief and damages. Lien counterclaimed seeking actual and punitive damages for the alleged breach of the license agreement. During the intervening three years before trial, hostile discovery eventually produced those documents which called San Juan's trademark into question and revealed the dilution of its territorial control.

Upon conclusion of the trial, the court found San Juan's trademark void from the outset and consequently denied San Juan's demand for injunctive relief[2] and damages. The court held that Lien had not splashed the San Juan pool not only because of the design change made in the shallow end but also because of Lien's considerable investment in the mold and the custom and practice of the fiberglass pool industry. The court found the claim for violation of a common law trademark was "utterly frivolous" because San Juan had never done business in Kansas.

The court held Lien's license to be voidable either because of the misrepresentation from its inception or a theory of mutual mistake, citing *Donald F. Duncan, Inc. v. Royal Tops Mfg. Co.*, 343 F.2d 655 (7th Cir.1965). Because of the invalid trademark and void license, the court concluded that injunctive relief was inappropriate and damages were not proved. Observing that the limitation period for breach of the license agreement had passed, the court was satisfied Lien had not been damaged by the breach and had continued to operate its business successfully.

Having found no trademark on which to hinge a claim for attorney fees under the Lanham Act, the court exercised its "inherent equitable power" to award Lien all attorney fees and expenses incurred in the defense of the case. The court was convinced that San Juan's attorneys knew or should have known "well in advance of trial that their case is without merit, that they have no exclusivity rights under any trademark, and indeed, that they have never been damaged in Kansas, yet insist upon full trial of the matter for no other reason than to intimidate the defendants...." Although the court had stated both at the outset and close of trial that Rule 11 sanctions might be "in order," the court did not invoke the rule.

Review of the district court's conclusions that the trademark and license agreement were void from the outset disposes of the several subsidiary issues San Juan has raised. To disturb the district court's judgment, we must determine the findings of fact were clearly erroneous, Fed.R.Civ.P. 52(a), and that its conclusions were contrary to law.

## II. San Juan's Trademark

The district court had jurisdiction to entertain Lien's challenge to San Juan's trademark. When an action involves a trademark registration, the district court

---

1. According to Mr. Lohman's testimony: [S]plashing refers to buying someone else's product and then building a production mold off of it. [It] has nothing to do with copying of shapes or copying of size or profile.... It allows the person that is splashing to sidestep the time and expense of first coming up with the idea of what they are going to build....

2. In fact, before suit was filed, Lien changed the corporate and trade names of the company to Free Spirit Pools, Inc.

"may determine the right to registration, order the cancellation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action." 15 U.S.C. § 1119; *see Windsurfing Intern. Inc. v. AMF Inc.*, 828 F.2d 755 (Fed.Cir.1987). Of course, the parties must properly plead the relief sought under 15 U.S.C. § 1119.

As previously noted, only after rancorous discovery Lien became aware that San Juan apparently did not hold "the exclusive right" to use the SAN JUAN trademark. The court permitted Lien to amend its answer to assert the "affirmative defenses" that San Juan had abandoned and forfeited any rights in and to the SAN JUAN mark and that the SAN JUAN mark was void from the outset because it was fraudulently procured.[3] The pretrial order includes defendants' contention that "U.S. Trademark Registration No. 888,124, SAN JUAN, should be canceled and, pursuant to 15 U.S.C.A. § 1120, defendants should be awarded their damages, including attorney fees, in defending this action."

Our review is complicated by two concerns. First, although the district court had jurisdiction over the counterclaim, it is not clear that the defendants properly invoked this jurisdiction. Second, in declaring the trademark void, the court qualified, *"For the purpose of this decision,* the plaintiff's trademark is a nullity and in this Court's view *should be* stricken from the record of the Trademark Office." (Emphasis added.) This conclusion was based on a finding that San Juan never had the exclusive use of the SAN JUAN mark because of the agreement with the Starks, and that in failing to communicate its nonexclusive use to the PTO, San Juan perpetrated fraud on the PTO.

The district court's finding fraud in the procurement of the registration is undercut by Lien's failure to properly plead fraud in the counterclaim. Rule 9(b) of the Federal Rules of Civil Procedure [4] appears to have been entirely overlooked or ignored. Nevertheless, fraud in the procurement must be alleged with specificity as required by Rule 9(b), both in federal court and in PTO administrative proceedings. 2 J. McCarthy, *Trademarks and Unfair Competition* § 31:21(D), at 616 (hereinafter J. McCarthy). Indeed, the pleader must "state[ ] with sufficient specificity the factual bases for its allegation." *King Automotive, Inc. v. Speedy Muffler King, Inc.*, 667 F.2d 1008, 1010 (C.C.P.A.1981). "Rule 9(b) requires that the pleadings contain explicit rather than implied expression of the circumstances constituting fraud." *Id.* (citations omitted).

Even were this procedural flaw overlooked, we could not overcome the weight of authority adverse to the district court's finding on the merits. As discussed in *Trademarks and Unfair Competition*, the allegation of "failure to disclose use by others" spawns the greatest number of fraud in the procurement cases but remains "a serious charge which is not easily proven." 2 J. McCarthy, § 31:21, at 614. The "oath" an applicant signs requires only that the declarant state "to the best of *his knowledge and belief* no other person, firm, corporation, or association has the right to use said mark in commerce." The statement questions the declarant's subjective, "honestly held, good faith" *belief.* 2 J. McCarthy, § 31:21, at 612 (citation omitted).[5] The Court of Appeals for the Feder-

---

3. Lien then amended the pleadings "to assert, as an additional *counterclaim* against plaintiff, a claim for attorney fees under the Lanham Act and applicable state law based upon the plaintiff's assertions of groundless claims of trademark infringement." In the pretrial order, defendants sought attorney fees under 15 U.S.C. §§ 1117 and 1120, and Kan.Stat.Ann. § 60–2007 (1983), Assessment of costs of frivolous claim, defense or denial.

4. Fed.R.Civ.P. 9(b) states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

5. J. McCarthy continues:

 There is nothing in the oath or the statute which requires applicant to disclose anyone who in fact may be using the mark, but does not, *in the applicant's belief,* possess the legal *right* to use. The oath is not a guarantee that no other firm has a legal right to use the mark.

 § 31:21, at 612 (emphasis added).

al Circuit has stated that 15 U.S.C. § 1051 and 37 C.F.R. § 2.33(b) "require the statement of *beliefs* about exclusive rights, not their actual possession." *American Sec. Bank v. American Sec. & Trust Co.*, 571 F.2d 564, 568 (C.C.P.A.1978).

■ Thus, to prove that San Juan committed fraud in the procurement of its federal trademark, Lien was required to plead and prove (1) the false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false (scienter); (3) the intention to induce action or refraining from action in reliance on the misrepresentation; (4) reasonable reliance on the misrepresentation; and (5) damages proximately resulting from such reliance. 2 J. McCarthy, § 31:21, at 602. The knowing misrepresentation must be material. "[I]t is probably the law that in the trademark context, a material misrepresentation arises only if the registration should not have issued if the truth were known to the examiner." *Id.* at 606.[6]

In a similar case, the Federal Circuit held the trademark applicant had not committed fraud in its unrestricted nationwide registration despite its agreement not to use the mark in a limited geographical area. *Rosso and Mastracco, Inc. v. Giant Food Inc.*, 720 F.2d 1263 (Fed.Cir.1983). Appellants sought to cancel Giant Food's registration "on the ground that Giant had a duty, which it failed to carry out, to continuously review and amend the oath filed with its application for registration...." *Id.* at 1265. While the court recognized a duty of truthfulness, the statutory exceptions and case law we have already noted were cited to qualify that disclosure duty. The court observed, however:

> On the other hand, the oath in an application for registration must be truthful.

Thus, in some instances a senior user would be making a false oath where he fails to acknowledge conflicting rights of a junior user which are clearly established, for example, by a court decree, by the terms of a settlement agreement, or by a registration. However, the rights of a junior user must be clearly established and must be in an identical mark or one so similar as to be clearly likely to cause confusion.

*Id.* at 1266. The Federal Circuit then concluded Giant Food's settlement agreement "is not one in which the parties acknowledged that use of the respective marks would be likely to cause confusion. The parties agreed to a division of trade territory regardless of confusion." *Id.* In our case, there is nothing in the 1970 Stark settlement agreement which qualifies the original transfer of the trademark to San Juan on the basis of confusion. The record is silent on the state of use and state of mind that underlay the mark transfer.

■ The only testimony in the record on the signing of the trademark application was elicited from Erv Parent on cross-examination. Defense counsel asked Parent (1) if he signed the 1969 application, and (2) if he signed it after the 1968 agreement with the Starks. This proof falls short. There is no testimony to establish the objective falsity of the statement in light of the application's requirement that the declarant aver a good faith belief and the weight of authority on the burden of disclosure. See *Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666 (7th Cir.1982).[7]

Nevertheless, the district court found that "[c]learly Mr. Parent knew, or is conclusively presumed to have known when he executed the affidavit of continuous use ... that plaintiff had *no right whatever* to use the mark SAN JUAN, but he did not so

---

**6.** The record contains no evidence of the PTO's search report preceding the final registration. Nor does the record disclose whether, for example, the prior user, Starks, had procured a nationwide registration.

**7.** In dicta, *Money Store* specifically questions whether the applicant for a MONEY STORE mark who knew of another MONEY STORE user which was exclusively operating in one

state with advertising extending across state lines acted fraudulently. Although the specific question was not before the court, the Seventh Circuit stated, "We do not believe that Modern Acceptance would have acted fraudulently even if it had signed the oath knowing all the facts of Peoples' use of the mark as presented at trial in the present case." 689 F.2d at 672, n. 6.

inform the U.S. Patent and Trademark Office." (Emphasis added.) The court reached that conclusion on the evidence of Parent's signing the respective agreements with Stark and Harman. The court did not consider the original settlement agreement which gave Parent all right, title, and interest in the marks and patents of SAN JUAN. The court's conclusion presumes the existence of an applicant's affirmative duty to disclose all other uses of the mark. *See King Automotive,* 667 F.2d at 1011.[8] Moreover, the court's conclusion presumes facts about the Starks' right to use that are not in the record. Contrary to the court's explicit finding, there is no testimony whether Mr. Parent "actually knew others had a *legal, contractual* right to use the mark."[9] In light of this factual setting, no clear and convincing evidence satisfies the strictures for proving fraud or provides any basis for cancellation or damages. *Money Store,* 689 F.2d at 670. "[F]raud is not lightly to be presumed...." *Anheuser-Busch, Inc. v. Bavarian Brewing Co.,* 264 F.2d 88, 92 (6th Cir.1959).

■ Unlike the registration of a patent, a trademark registration of itself *does not create the underlying right to exclude.* 2 J. McCarthy, § 31:21, at 604. Nor is a trademark created by registration. While federal registration triggers certain substantive and procedural rights, the absence of federal registration does not unleash the mark to public use. The Lanham Act protects unregistered marks as does the common law.

For these reasons, we find the evidence insufficient to conclude the oath signed by Mr. Parent was knowingly false. Consequently, San Juan's federal registration of the SAN JUAN mark remains valid.

### III. License Agreement

■ Once the issue of the validity of the trademark is removed, we may sharpen our review on the real concern of this case. As the district court correctly discerned, this case is about proprietary rights based on the Lien–San Juan license agreement. San Juan framed the issue of Lien's alleged breach of this license as a predicate for trademark infringement. Instead, the evidence conclusively established that Lien's license was either void from the outset or voidable at its instance because San Juan had already given to SUN the exclusive rights to sign up installing dealers in Kansas. As Parent testified, it never occurred to him, "never rang a bell," that Lien "had Kansas."

The evidence framed a scenario in which Parent was apportioning off sales areas, Sullivan and Lohman were actively trying to reassert the company's control, and Lien was caught in the cross fire. San Juan never established common law trademark protection in Kansas because it never did any business there.[10] While there was an

---

**8.** In *King Automotive,* the court dismissed the petition stating,

> Even if the disclosures in the trademark search report supported appellant's contention that Discoverer knew of the alleged third-party use of MUFFLER KING (and on this point we express no opinion), appellant's conclusory statement that Discoverer knew its declaration to be untrue is not supported by a pleading of any facts which reflect Discoverer's belief that the respective uses of MUFFLER KING and SPEEDY MUFFLER KING would be likely to confuse.

667 F.2d at 1011 (citation omitted).

**9.** The court's authority to support its conclusion is inapposite. The court cited *le Cordon Bleu, S.A. v. BPC Publishing Ltd.,* 451 F.Supp. 63 (S.D.N.Y.1978) (plaintiff's magazine trademark canceled based on evidence that no publications sold in United States); *Polo Fashions, Inc. v. Extra Special Products, Inc.,* 451 F.Supp. 555 (S.D.N.Y.1978) (although "polo" is descriptive term for type of shirt, "POLO by RALPH LAUREN" and "POLO" with "POLO PLAYER" are distinctive and protected by injunctive relief); *Electrical Information Publications v. C–M Periodicals, Inc.,* 163 U.S.P.Q. 624 (D.Ill.1969) (plaintiff, who knew of nonuse of registered mark and whose own actions contributed to the generic use and dilution of term "food service," knowingly committed fraud on PTO in alleging continuous use); *King–Size, Inc. v. Frank's King Size Clothes, Inc.,* 547 F.Supp. 1138 (S.D.Tex.1982) (claim for cancellation denied absent proof that federal registrations procured by fraud since term is not common and descriptive).

**10.** We do not accept San Juan's characterization of Lien's third party rights defense to the claim of common law trademark infringement. Moreover, the evidence does not support the contention that San Juan established its com-

interval during which Lien used the SAN JUAN mark beyond the purported license term, there was testimony to establish that Lien was careful to represent the origin of its pools and even changed the corporate name to FREE SPIRIT POOLS shortly after San Juan demanded it cease using its name. Clearly, while San Juan had no proprietary rights in Kansas to vindicate through Lien's dealership, Lien suffered no damage from the assertion of those purported rights. As the court correctly noted, the passage of time defeated both San Juan's need for injunctive relief and Lien's claim for damages based on the breach of the license agreement. Moreover, the court correctly decided that Lien had not splashed the San Juan pool, but had sufficiently established that both in its investment in developing a mold and changing the design, Lien maintained its pool business according to the custom and practice of the industry. We, therefore, conclude the district court did not err in its findings of fact and conclusions of law on the issues of the license agreement, statutory and common law trademark infringement, splashing and palming off, and the availability of the defense of licensee estoppel.

## IV. Attorney Fees

The district court awarded $98,137.87 representing the total claim of defense counsel for fees and expenses. The court rejected awarding attorney fees under the Lanham Act, 15 U.S.C. § 1117 [11] and § 1120 [12], instead tying the award to the court's inherent equitable power to award

defendants their attorney fees. The court appeared [13] to reject awarding fees under the Lanham Act both because the mark was invalid and because no damages were established through unfair competition, trademark infringement or other activity protected by a trademark.

On appeal, San Juan objects to the manner and substance of the award of attorney fees. San Juan contends the court awarded the entire amount of fees requested without holding a formal, noticed hearing in open court. The record contradicts this assertion. When the district court entered its memorandum and order on August 21, 1985, the court instructed defense counsel to share defendants' statement of attorney fees incurred with plaintiff counsel "in the interest of reaching accord." In the event no agreement would result, the court instructed defense counsel to notify the court in order to set a hearing on attorney fees.[14] In the subsequent hearing on attorney fees held on February 3, 1986, San Juan's counsel complained it was notified only a week before the hearing. Defense counsel explained that its motion for attorney fees and expenses, filed November 8, 1985, was not responded to by plaintiff's Kansas counsel until January 23, 1986, at which time only general objections to the accounting were raised, and no "counter-affidavits" were filed. Consequently, at the February hearing, the district court denied San Juan's motion for an extension of time in order to prepare for the hearing, finding both local and California counsel had ample

---

mon law rights in Kansas by virtue of Lien's use.

**11.** 15 U.S.C. § 1117 states:

When a violation of any right of a registrant of a mark registered in the Patent and Trademark Office shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled ... to recover ... (3) the costs of the action.... The court in exceptional cases may award reasonable attorney fees to the prevailing party.

**12.** 15 U.S.C. § 1120 states:

Any person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof.

**13.** At the hearing to set the fees, defense counsel stated that the court's order clearly awarded attorney fees under §§ 1117, 1120, *and* the

court's inherent equitable power. To plaintiff counsel's objection that Lien's counsel had misread the order, the court responded, "In my view it is [a correct reading]." In its order, the court cited *General Motors Corp. v. Cadillac Marine & Boat Co.,* 226 F.Supp. 716 (W.D.Mich. 1964), which ultimately awarded fees under the bad faith exception. If the court intended to award fees under the Lanham Act, it failed to cite the applicable section and make the necessary findings under either section. That is, no damages were sustained to permit an award under § 1120; and the court did not make a finding of "exceptional circumstances" as required under § 1117. In fact, because we believe the order speaks for itself, we conclude the court did not believe fees were available under the Lanham Act.

**14.** Although defense counsel's November motion for a hearing on attorney fees, with accompanying brief and affidavits, is in the record, there is no subsequent minute order from the court setting the February hearing date.

time to contest Lien's request.[15] Responding to San Juan's objection that the in-chambers hearing fell short of the required evidentiary hearing with expert testimony, the court stated that not only did this court encourage the procedure but also that having participated in each stage of the proceeding, it was capable of understanding what was reasonably expended in attorney fees.

■ We do not believe the district court abused its discretion in dictating this informal procedure in light of its extensive experience with the case. *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 453 (10th Cir.1988); *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1201 (10th Cir.1986) (since trial court saw attorneys' work first hand, it has far better means of knowing what is just and reasonable than appellate court). "The court itself may be considered an expert in setting legal fees." *Kopunec v. Nelson*, 801 F.2d 1226, 1229 (10th Cir.1986) (citation omitted). Although we do not have the court's order setting the hearing in the record, we are satisfied that plaintiff counsel had sufficient notice after the court's August order. San Juan knew of its potential liability for significant attorney fees and cannot now complain that it was denied due process in having to defend its position in a summary hearing.

The court awarded attorney fees based on its inherent equitable power. We presume the court was relying on the recognized exception to the American Rule, *see Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), that when an unfounded action is brought or maintained in bad faith, wantonly, vexatiously or for oppressive reasons, the court may arm itself with "the power of the equity judge to do justice." 6 J. Moore, *Federal Practice* ¶ 54.-78[3], at 500 (2d ed. 1987). We have stated that to fall within the bad faith exception the claim must be entirely without color and asserted wantonly, "for purposes of harassment of delay, or for other improper reasons." *Sterling Energy, Ltd. v. Friendly Nat. Bank*, 744 F.2d 1433, 1435 (10th Cir.1984) (quoting *Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078, 1088 (2d Cir.1977)). "Neither meritlessness alone nor improper mo-

tives will suffice." *Colombrito v. Kelly*, 764 F.2d 122, 133 (2d Cir.1985) (citations omitted). The standard for finding bad faith must be narrowly drawn to avoid deterring litigants with colorable though untested claims for seeking a federal forum. *Sterling*, 744 F.2d at 1435. In these cases, "the underlying rationale for fee-shifting is punitive and the 'bad faith' is an essential element." 6 J. Moore, ¶ 54.78[3], at 501 (citations omitted). Moreover, "the penalty can be imposed 'only in exceptional cases and for dominating reasons of justice.'" *Cornwall v. Robinson*, 654 F.2d 685, 687 (10th Cir.1981)(citation omitted).

The district court found San Juan instituted and conducted the action "for no other reason than to intimidate the defendants," and the case was "wholly frivolous." The court characterized San Juan as a "bully-type" that sought out Lien in its effort to reorganize and retake control of its installing and manufacturing programs. Central to the court's finding vexatiousness and frivolousness was the extended discovery conflict between the parties in which, apparently, key documents like the SUN agreement were obtained only after repeated confrontation and court intervention. In the face of the discovery revelations, the court observed at the hearing on attorney fees that plaintiff insisted on going to trial, and Lien "kicked the thunder out of San Juan, and rightly so."

■ We will reverse an award of attorney fees under the bad faith exception "only in circumstances which do not show a reasonable ground for the conclusion that vexatiousness existed." *Cornwall*, 654 F.2d at 687 (quoting *Ryan v. Hatfield*, 578 F.2d 275, 277 (10th Cir.1978)). Although the trial court does not directly connect factual instances to its ultimate finding, the order as a whole established that San Juan essentially brought suit for trademark infringement based on a license agreement which it executed without the right to do so. The proprietary rights at issue were the rights emanating from that purported license. Clearly, only after diligent discovery did Lien establish its rights were already taken. San Juan's efforts to finesse this central fact underlie the court's finding bad faith in its pursuing this litigation. We do not believe the district court's conclusions were clearly erroneous.

**15.** Defense counsel represented it had fully responded to plaintiff's January 23 objections by brief mailed on January 30, 1986. San Juan complained at the hearing on February 3 that it had not received the brief prior to the hearing.

The district court reviewed the affidavits and billing statements submitted by defense attorneys and entertained objections at the hearing. San Juan had questioned possible double billing in the time sheets, the failure to differentiate between time spent on unsuccessful counterclaims, and the comparison of the fees requested with a possible prior fee agreement with Lien. The court, indicating the time it had spent reviewing the statements, concluded the statements were "professionally drafted" and adequately reflected time necessarily expended to defend the lawsuit successfully. The court applied a standard Lodestar method, judged prevailing reasonable rates in the Wichita area, and applied those rates to his understanding of the course of the litigation. Contrary to San Juan's contention, the court properly considered *Ramos v. Lamm*, 713 F.2d 546 (10th Cir.1983), and gave us an adequate basis for review. As such, we do not believe the court abused its discretion and affirm the award of attorney fees.

In addition, Lien requests attorney fees for defending this appeal contending fees and expenses are due when it successfully defends the district court's original award [16] and under Fed.R.App.P. 38 on the ground the appeal is frivolous. Lien seeks remand of the case for the district court to set an appropriate fee.

We have recently stated, "An appeal is frivolous when the result is obvious, or the appellant's arguments of error are wholly without merit." *Braley v. Campbell*, 832 F.2d 1504, 1510 (10th Cir.1987). In this appeal, San Juan successfully challenged the district court's disposition of its trademark and properly raised the issue of the grounds and manner of the trial court award of attorney fees. Clearly, the appeal was neither frivolous nor brought for purposes of delay. *Id.* (citation omitted).

In sum, we REVERSE the district court's finding the trademark void and canceled for purposes of the action; AFFIRM the court's findings of fact and conclusions of law on the breach of the license agreement, unfair competition and trademark infringement; and AFFIRM the award of attorney fees for prosecution of the principal action.

---

**16.** As authority for this proposition, Lien cites cases involving civil rights challenges in which attorney fees were initially awarded under either §§ 1983 or 1988.