Betty and Stanley ROSS,
Plaintiffs–Appellants,

v.

WESTERN FIDELITY INSURANCE COMPANY, Defendant–Appellee.

No. 88–4465.

United States Court of Appeals,
Fifth Circuit.

May 11, 1989.

666

Stephen L. Henning, Batesville, Miss., for plaintiffs-appellants.

John H. Dunbar, Robert H. Faulks, Oxford, Miss., for defendant-appellee.

Before GARZA, JOLLY and JONES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Betty and Stanley Ross appeal from a summary judgment dismissing their claim for insurance coverage of their infant daughter's heart operation. Because the pre-existing-conditions clauses of the insurance policy do not exclude coverage of their daughter's heart condition, we reverse and remand for further proceedings.

## I

Jennifer Ross was born on February 19, 1986. Later that day, after experiencing respiratory distress and cyanosis (turning blue), she was transferred to an intensive care unit where she was given oxygen and evaluated further. Evaluation included a blood gas test, which indicated a low blood oxygen level, and a chest x-ray, which showed an enlarged right heart. No heart murmur was detected. Dr. Nancy Chase, a pediatric cardiologist, concluded from these symptoms that Jennifer was suffering from pulmonary hypertension (high blood pressure in the blood circulating between the heart and the lungs). Dr. Chase nevertheless ordered a diagnostic test, known as a two-dimensional echocardiogram, in order to rule out total anomalous pulmonary drainage (a condition in which all four veins returning from the lungs to the heart improperly feed into the right side of the heart instead of the left). Although some of Jennifer's symptoms may have been consistent with a congenital heart defect such as anomalous pulmonary drainage, the two-dimensional echocardiagram of the heart showed at least one pulmonary vein feeding correctly into the left side. Furthermore, according to the report of the doctor conducting the test, it "did not demonstrate any cardiac defect, but pulmonary hypertension was apparent." In the meantime, Jennifer was rapidly weaned off oxygen onto room air, and was discharged from the hospital a week after her birth.

After incurring substantial hospital bills on account of the complications following Jennifer's birth, the Rosses decided to purchase medical insurance. They were considering Blue Cross/Blue Shield of Mississippi, but Larry O'Connor, an independent insurance agent, told them he had a better policy. He met with the Rosses in their home on March 19, 1986, and prepared for them an application for a policy with Western Fidelity Insurance Company. At this meeting, both the Rosses and Dorothy Matthews Farrow, a friend, told O'Connor about the health problems of Jennifer's first week. O'Connor summarized these problems on the application by noting merely that Jennifer had been premature, telling the Rosses that his notation would be a red flag, signalling the company to check Jennifer's medical records before deciding to insure her health. Mrs. Ross looked over the finished application but did not read it. Mr. Ross cannot read. O'Connor had the Rosses sign the finished application and a blank one, and later had his wife transcribe the information onto the blank application. Based on the information on the submitted application, Western Fidelity issued a policy effective April 1, 1986, insuring the Rosses, including Jennifer, for up to $100,000 in benefits subject to the limitations and exclusions in the policy.

At Jennifer's monthly checkups, Mrs. Ross expressed to the doctor her concern over Jennifer's low weight and rapid breathing, but was told that the child was in good health. On August 21, 1986, however, Mrs. Ross took Jennifer to the doctor after the baby choked on her bottle and began coughing badly. For the first time, a heart murmur was detected, and Jennifer was re-referred to Dr. Chase. This time, a two-dimensional echocardiogram showed clearly a very large atrial septal defect (a hole between the left and right atria of the heart), through which blood from some pulmonary veins was draining improperly back into the right side of the heart. This condition is also known as a "left-to-right shunt," and is a form of congestive heart failure. Jennifer underwent surgery, which successfully corrected her heart defect.

The Rosses submitted a claim to Western Fidelity, which denied the claim, stating that the company would not have insured Jennifer if it had known of her medical history and that it was deleting Jennifer from the policy.

The Rosses then sued Western Fidelity in state court for payment of the medical expenses, plus extra-contractual compensatory and punitive damages. Western Fidelity removed the case to federal court. The district court granted summary judgment to Western Fidelity. The court held that the heart defect was a pre-existing condi-

tion excluded from coverage, and that denial of the claim on this basis did not breach the contract. The court, however, denied summary judgment on Western Fidelity's defenses of misrepresentation and mistake, as well as its defense based on the sickness clause of the policy. The court also granted Western Fidelity summary judgment against the Rosses' claim that Western Fidelity fraudulently induced them to purchase the policy and that Western Fidelity fraudulently concealed certain facts. Because the court held that Western Fidelity had not breached the contract or committed fraud, it dismissed the complaint without reaching the claim for punitive damages.

The Rosses appeal. For the reasons discussed below, we reverse, and remand the case to the district court for further proceedings.

## II

First, we set out the standard of review. The district court granted summary judgment. We therefore view the facts most favorably to the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Furthermore, interpretation of a contract is a question of law, including the question whether the contract is ambiguous. *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986). Thus, review of the district court's decision in this case is *de novo*. In addition, we note that the substantive law of Mississippi controls this case.

## III

### A.

The summary judgment was based on the policy's exclusion of coverage for pre-existing conditions. This exclusion appears in two places: first, it appears in "The Insuring Clause," in which Western Fidelity agrees to insure the Rosses and pay for specified expenses resulting from, *inter alia*, "pre-existing conditions ... only if the loss occurs after this policy has been in force for twenty-four months...."; and second, a separate clause entitled "Pre–Ex-

isting Condition Limitations" repeats this language. Under "Definitions," the policy provides in two clauses as follows:

Pre-existing condition means the existence of symptoms which would cause an ordinarily prudent person to seek diagnosis, care or treatment within a five year period prior to the Effective Date of the policy; or a condition for which medical advice or treatment was recommended by or received from a physician within a five year period prior to the Effective Date of the policy.

Our first task is to interpret this definition in the light of the facts of this case.

Since Mississippi law controls this case, we rely on the fundamental rules for construing contracts in Mississippi. First, of course, where the contract is unambiguous, the court is required to give effect to the intentions of the parties as reflected in the language of the contract. *Shaw v. Burchfield*, 481 So.2d 247, 252 (Miss.1985); *Pfisterer v. Noble*, 320 So.2d 383, 384 (Miss. 1975). Courts must construe contracts so that they give effect to all provisions and do not produce an unfair and unreasonable result. *Glantz Contracting Co. v. General Electric Co.*, 379 So.2d 912, 917 (Miss. 1980). A written instrument must be considered as a whole and all parts construed together. *Texaco, Inc. v. Kennedy*, 271 So.2d 450, 452 (Miss.1973). The meaning of a contract cannot be ascertained by resort to solitary or fragmentary parts. *Id.*

### B.

In accordance with these rules, we read the two clauses of the definition of "pre-existing condition" together to determine their meaning. The first clause defines "pre-existing condition" in terms of symptoms that *would cause* an ordinarily prudent person to seek medical attention, while the second clause defines "pre-existing condition" as a condition that *did cause* the insured to obtain medical attention. Reading the clauses together, we conclude that the first clause applies to situations in which the insured had symptoms of a condition but failed to seek diagnosis, care or treatment, whereas the second clause ap-

plies to situations in which advice or treatment regarding the condition was actually obtained. This distinction between the two clauses is apparent and unambiguously intended by the language of the policy.

## C.

■ In the case before us, counsel for Western Fidelity stated that it was relying upon the second clause of the definition; that is, Western Fidelity is claiming that the heart defect constituted "a condition for which medical advice or treatment was recommended by or received from a physician within a five year period prior to the Effective Date of the policy." Jennifer's heart defect was not, under this clause, a pre-existing condition for the simple reason that her heart defect was not diagnosed or treated until August 1986. Since the heart defect was not diagnosed during Jennifer's first week, the advice and treatment she received at that time could not have been *for that condition;* rather, pulmonary hypertension was the only condition diagnosed and treated at that time. Thus, the plain language of the clause leads to the conclusion that it does not exclude coverage of the heart defect.

We note also that Mississippi cases have construed clauses limiting coverage of pre-existing sickness or conditions to require distinct symptoms from which the underlying condition can be reasonably diagnosed. *See, e.g., Thompson v. Council Ins. Co. of Newark, N.J.,* 344 So.2d 135 (Miss.1977); *Blue Cross & Blue Shield of Mississippi, Inc. v. Mosley,* 317 So.2d 58 (Miss.1975); *Mutual of Omaha Ins. Co. v. Walley,* 251 Miss. 780, 171 So.2d 358 (1965). The pre-existing conditions clause before us is not necessarily controlled by these cases, however, since the exclusions in those policies did not refer to advice or treatment as a basis for the pre-existing condition, as here. The meaning of the policy before us is plain from its language and is not inconsistent with these prior cases or with any other Mississippi law or public policy. Thus, we apply it straightforwardly, and reject any defense to coverage based on the pre-existing conditions clause of this policy.

## IV

■ In the alternative, Western Fidelity relies on the "sickness" clause of the policy as grounds for denying the Rosses' claim. The "Insuring Clause" agrees to pay for specified medical expenses "resulting from sickness, which first manifests itself more than 30 days after the effective date of this notice and while this policy is in force...." According to Western Fidelity, this clause provides grounds for denying the Rosses' claim because Jennifer's symptoms were manifest before thirty days after the policy became effective. We cannot agree. This clause operates to exclude only a sickness that first *manifests* itself before a certain date. To be "manifest," a sickness must be apparent, obvious, or plain. The heart defect here did not manifest itself during the excluded time frame. Despite the presence of symptoms that may have been caused by the heart defect, the heart defect itself was not diagnosed and therefore was not apparent, obvious, or plain. Thus, it did not manifest itself during the excluded period.

Again, we recognize the Mississippi cases construing similar limitations on coverage, but find that they do not control our interpretation here. *See Thompson,* 344 So.2d at 136 (coverage for "sickness or disease which commences ... while this policy is in force"); *Mosley,* 317 So.2d at 59 ("no benefits provided for ... ailment, disease or physical condition existing at or before the effective date"); *Walley,* 171 So.2d at 359 (coverage for "sickness contracted while this policy is in force and more than 30 days ... after the Policy Date"). In contrast to these cases, the policy before us now covers sickness that first *manifests* itself more than thirty days after the effective date. As stated above, the everyday meaning of "manifest" controls our interpretation, and coverage is not excluded under the sickness clause of this policy.

## V

■ As a final alternative ground for affirming the summary judgment, Western Fidelity relies on its counterclaim that the

policy was rescindable for misrepresentation or mistake. The district court properly denied summary judgment on this counterclaim. An insurance company cannot avoid a policy on the ground that material information was withheld when that information was given to the insurer's agent who took charge of preparation of the application. *National Life and Accident Ins. Co. v. Miller,* 484 So.2d 329, 334 (Miss. 1985). Here, the Rosses claim to have informed the agent, O'Connor, of Jennifer's medical history. Thus, there is at least a genuine issue of fact as to whether Western Fidelity had knowledge, imputed through O'Connor, of Jennifer's medical condition. Accordingly, summary judgment on this counterclaim is inappropriate and was properly denied.

## VI

■ In granting Western Fidelity summary judgment, the district court also rejected the Rosses' claim that Western Fidelity, through O'Connor, fraudulently induced them to enter into the insurance contract and fraudulently concealed material facts. The Rosses essentially present two theories. Under one theory, they claim that they were defrauded because the policy states that all policy provisions conflicting with state statutes are amended to conform with those statutes, yet Western Fidelity construes its definition of pre-existing conditions, based on symptoms, more broadly than judicial interpretations in Mississippi. This argument is meritless. As the district court noted, Mississippi courts have interpreted pre-existing condition and sickness clauses only where the policies did not adequately define the terms. *See, e.g., Thompson,* 344 So.2d at 136–37; *Walley,* 171 So.2d at 358–60. In general, clauses excluding coverage of conditions originating before a specified date are valid and enforceable. *Ford Life Ins. Co. v. Shannon,* 328 So.2d 342, 344 (Miss.1976) (quoting *Walley,* 171 So.2d at 359). Thus, Western Fidelity's use of its own contract language is not inconsistent with its intention to comply with state law.

■ The Rosses' second theory is more plausible. They claim that O'Connor, as Western Fidelity's agent, falsely represented that the company would check Jennifer's medical records before deciding whether to insure her health, thereby also concealing the fact that the company could issue the policy without investigating its validity until a claim was made. The Rosses rely on evidence that they informed O'Connor of Jennifer's medical history, that he wrote on the application only that she had been premature, and that he told the Rosses that his notation would trigger an investigation by the company after which it would decide whether to insure Jennifer or whether to add a rider to the policy specifically qualifying coverage of Jennifer's health. O'Connor later delivered to the Rosses the Western Fidelity policy, which contained no special exceptions or riders. According to the Rosses, they relied on O'Connor's statements as meaning that the policy as issued would be valid.

The district court rejected this argument on the grounds that O'Connor's statements "were promissory in nature and related to future actions of a third party upon which the plaintiffs had no right to rely." Although the right to rely on a representation is a necessary element in an action for fraud, *Haygood v. First National Bank,* 517 So.2d 553, 555 (Miss.1987), we disagree with this characterization of the representations. O'Connor's statements were not merely promises as to future actions; rather, they were representations relating to the company's underwriting procedures. Furthermore, when acting as the company's agent, O'Connor was not referring to a legal third party when he referred to Western Fidelity. Finally, we are unable to say at this stage of the proceedings that the Rosses had no right to rely on O'Connor's representations as to the company's underwriting procedures. We therefore reverse the judgment of the district court insofar as it dismissed this theory of the Rosses' fraud claim on the basis that it did. We express no opinion, however, on whether the fraud claim may lack viability for other reasons in law or in fact.

## VII

To sum up, we hold that Western Fidelity cannot maintain a defense based on the pre-existing conditions clause nor on the sickness clause of this policy. As a result, the Rosses' contract claim should not have been dismissed. Furthermore, Western Fidelity was properly denied summary judgment on its counterclaim for rescission, but that counterclaim could still prevail if disputed facts are subsequently resolved in Western Fidelity's favor. Finally, the Rosses' action for fraud based on the agent's representations was improperly dismissed and on remand requires the resolution of issues of disputed fact and law. We therefore reverse in part, affirm in part, and remand for further proceedings not inconsistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART and REMANDED.