Charlotte A. PITCHER, Plaintiff,

v.

PRINCIPAL MUTUAL LIFE INSURANCE COMPANY, a Member of the Principal Financial Group, Defendant.

No. IP 93–0869–C H/G.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Dec. 15, 1994.

Cynthia J. Atsatt, Bowman & Brooke, Minneapolis, MN, Frederick S. Bremer, Indianapolis, IN, for plaintiff.

Cynthia Locke Wodock, White & Raub, Indianapolis, IN, for defendant.

## ENTRY ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

HAMILTON, District Judge.

Plaintiff Charlotte Pitcher brought this action for damages against her employer's health insurer, Principal Mutual Life Insurance Company. Pitcher's coverage under the Principal Mutual policy became effective on September 17, 1992. One day later, a biopsy showed that Pitcher had breast cancer. She underwent surgery and radiation therapy. Principal Mutual has refused to pay for Pitcher's biopsy, surgery, and radiation treatments, relying on the preexisting condition clause in the insurance policy. The parties have filed cross-motions for summary judgment, and the facts concerning liability are not in dispute. The Court finds that, under the terms of the policy, the treatment and service that Pitcher received before the policy took effect were "for" her fibrocystic breast disease rather than "for" breast cancer. In the alternative, the policy is at least ambiguous as applied to Pitcher's combination of conditions, and must be construed in favor of the insured. The Court therefore grants plaintiff's motion for summary judgment as to liability and denies defendant's motion for summary judgment.

### Undisputed Facts

In May 1992, Pitcher began working on a part-time basis for The Center for Real Estate Education and Research in Bloomington, Indiana. In June 1992, the Center and Pitcher agreed that she should work full-time, but the start of her full-time employment was delayed until August 1992 because her immediate supervisor planned to be out of the country until then. Pitcher actually began full-time employment with the Center on August 17, 1992. She was insured effective September 17, 1992, under a group medical expense insurance policy underwritten by defendant Principal Mutual and issued to the Center. The insurance policy contains a provision that excludes coverage for a "preexisting condition." The policy defines a preexisting condition as "a sickness or injury for which a person was confined or received treatment or service in the 90–day period before becoming insured."

For approximately twenty years, Pitcher has had lumps in one or both breasts from time to time. According to her physician, these lumps had been manifestations of fibrocystic breast disease, a common condition which causes benign cysts, masses, and formations of fibrous tissue in the breasts. The undisputed evidence in this record on this motion is that, despite being labeled a "disease," the condition does not cause any deterioration in health, does not require treat-

ment, and does not develop into breast cancer. Affidavit of Dr. Harold Manifold ¶ 2. *See also Hardester v. Lincoln National Life Ins. Co.*, 841 F.Supp. 714, 716 (D.Md.1994) (fibrocystic breast disease not a "sickness"), *reversed*, 33 F.3d 330 (4th Cir.1994), *rehearing en banc granted and panel opinion vacated*, October 13, 1994. *Cf. McCorkle v. Life General Security Ins. Co.*, 830 F.Supp. 1446, 1448 (M.D.Fla.1993) (fibrocystic breast disease required surgery).

On July 31, 1992, Pitcher had a routine physical examination in which lumps in both breasts were detected. Her physician believed the lumps were most likely signs of fibrocystic breast disease and would abate if Pitcher abstained from caffeine. He advised her to abstain from caffeine and to return in six weeks for a recheck. Pitcher returned for an exam on September 15, 1992, two days before her insurance coverage became effective. Her physician found the lumps were still palpable in both breasts, and he referred her for a mammogram that day. It is undisputed that, because Pitcher was 60 years old and had not had a mammogram in the past year, he would have recommended a mammogram even if the lumps had not been present. The mammogram showed a mass in the left breast that led the radiologist to recommend a biopsy. A biopsy was done three days later, September 18, 1992, the day after Pitcher's insurance coverage took effect. The biopsy showed a carcinoma of the left breast. Pitcher had a lumpectomy on October 5, 1992, followed by radiation treatment through December 27, 1992.

Pitcher submitted claims for benefits to Principal Mutual. After reviewing Pitcher's medical records, Principal Mutual concluded that the biopsy, lumpectomy, and radiation were treatments for a preexisting condition and therefore denied coverage. Pitcher sought review of that determination, and Principal Mutual stood by its denial of coverage. Pitcher then brought suit in the Monroe Circuit Court for breach of contract, breach of duty of good faith and fair dealing, and negligence. Principal Mutual properly removed the case to this Court because the action necessarily arises under ERISA, 29 U.S.C. §§ 1001, *et seq.*, and all of Pitcher's state law claims are preempted. *See Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). At Pitcher's request, and without objection from Principal Mutual, the Complaint shall be deemed amended to delete Counts Two, Three, and Four, and Pitcher's claim for breach of contract shall be treated as a claim for benefits pursuant to 29 U.S.C. § 1132(a)(1)(B).

## The Merits

■ Summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *E.g., Glass v. Dachel*, 2 F.3d 733, 740 (7th Cir.1993). The test for whether a factual issue is genuine is "whether, if the record of the summary judgment proceeding were the record of a trial, a jury or other trier of fact could rationally render a verdict for the nonmovant." *Colosi v. Electri–Flex Co.*, 965 F.2d 500, 504 (7th Cir.1992). The fact that the parties have filed cross-motions for summary judgment does not affect the applicable standard; the district court can deny both motions if there is a genuine issue of material fact. *E.g., Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993).

■ The insurance policy in this case does not contain language expressly giving the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. The parties therefore agree that this Court should conduct a *de novo* review of Principal Mutual's denial of benefits. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989).

■ Accordingly, this case becomes a matter of contract interpretation. Because federal law occupies the field of rights and obligations under ERISA-regulated benefit plans, the courts are to develop and apply a federal common law of contracts to determine those rights and obligations. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56, 107 S.Ct. 1549, 1557–58, 95 L.Ed.2d 39 (1987); *Thomason v. Aetna Life Ins. Co.*, 9 F.3d 645, 647 (7th Cir.1993). In interpreting the lan-

guage of contracts under ERISA, the Seventh Circuit has instructed the courts to:

> interpret the terms of the ... policy "in an ordinary and popular sense as would a [person] of average intelligence and experience." *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1441 (9th Cir.1990) (quoting *Allstate Insurance Co. v. Ellison*, 757 F.2d 1042, 1044 (9th Cir.1985)). Ambiguous terms in an insurance contract will be strictly construed in favor of the insured. *Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co.*, 924 F.2d 633, 638 (7th Cir.1991). However, we will "not artificially create ambiguity where none exists." *Evans*, 916 F.2d at 1441.

*Phillips v. Lincoln National Life Ins. Co.*, 978 F.2d 302, 308 (7th Cir.1992) (quoting *Hammond v. Fidelity & Guaranty Life Ins. Co.*, 965 F.2d 428, 430 (7th Cir.1992)).

 The key language in this contract is very short. For a period of 90 days after the policy takes effect, the policy does not cover treatment for "a sickness or injury for which a person was confined or received treatment or service in the ninety (90) day period before becoming insured." Both sides argue that this language is unambiguous and in their favor.[1] Pitcher argues that the lumps detected in the July 15, 1992, examination were not a "sickness" or "injury," but were merely a symptom of a condition that both she and her doctor believed was fibrocystic breast disease. She argues that any treatment or service she received before the policy took effect was "for" fibrocystic breast disease, and not for the cancer that was diagnosed with the biopsy after the policy took effect. Principal Mutual argues that the cancer was "manifest" in the form of the lumps before the policy took effect, and that the examinations and diagnostic services Pitcher received prior to the diagnosis of cancer were therefore treatment or service "for" the cancer, regardless of whether it had been diagnosed at the time.

"The purpose of pre-existing condition clauses is to protect 'insurers from fraudulent applicants seeking coverage for known diseases while protecting innocent premium paying insureds from being deprived of benefits for pre-existing conditions of which they have no knowledge.'" *Hardester v. Lincoln National Life Ins. Co.*, 841 F.Supp. at 716 (quoting *Mogil v. California Physicians Corp.*, 218 Cal.App.3d 1030, 267 Cal.Rptr. 487, 491 (1990)). Principal Mutual has not suggested, nor does the record indicate, that Pitcher engaged in any deceptive conduct in obtaining health coverage through her employer. To the contrary, the undisputed evidence on summary judgment indicates that Pitcher and her employer agreed in June 1992 (well before her routine examination on July 31) that she should go to work full-time, but that they delayed the start of her full-time employment for the convenience of the employer. In addition, the insurance policy did not even take effect until a month after Pitcher had started her full-time work. There is no evidence that Pitcher or her employer timed the start of her employment or the effective date of her insurance to help her medical situation.

The books contain many cases concerning preexisting condition clauses in health insurance contracts. The cases show that not all preexisting condition clauses are created equal. Some do not define the term "preexisting condition." Others apply only if, before the policy took effect, the condition was "manifest" through symptoms that would either prompt a reasonable person to seek medical care, or allow a medical professional to make an accurate diagnosis. Others, like this one, limit the term to conditions that have been treated. Some policies exclude any coverage for preexisting conditions. Others provide coverage for the condition after the policy has been in effect for some period of months. Some policies exclude coverage for a condition that has existed at any earlier time. Others exclude coverage only

---

1. The fact that parties to a contract disagree about its meaning does not, of course, show that it is ambiguous. *Federal Deposit Ins. Corp. v. W.R. Grace & Co.*, 877 F.2d 614, 621 (7th Cir. 1989). By the same token, the fact that both parties argue the contract is unambiguous does not preclude the Court from finding the contract to be ambiguous. *See le Cordon Bleu, S.A. v. BPC Publishing, Ltd.*, 451 F.Supp. 63, 69 n. 7 (S.D.N.Y.1978) (considering external evidence to construe contract both parties claimed was unambiguous).

for conditions that have produced symptoms or, like this policy, required treatment for some specified recent period of time.

From the array of case law applying various preexisting condition clauses, both parties have cited a number of cases to support their respective positions. Generally, those cases apply specific preexisting condition clauses to a variety of situations where the insureds showed some symptoms or received some treatment before their policies took effect, but where their real illnesses (or most serious illnesses) were not diagnosed accurately and treated until after the policies took effect. The decisions are far from uniform. Because each case is governed by a specific contractual provision, of course, the precedents are of limited value. This case must be decided by applying the specific language of this preexisting condition clause to this specific factual situation. The precedents nevertheless help illuminate the issues before this Court in applying this contract to this claimant.

Principal Mutual asserts that "the great weight of authority" supports its position. It supports that claim with cases holding that preexisting condition clauses in health insurance policies excluded illnesses that had produced symptoms before the policies took effect but that had not been diagnosed until after the policies took effect. A recent example, which discusses the issue in considerable detail, is *Mogil v. California Physicians Corp.*, 267 Cal.Rptr. at 490–93. The California Court of Appeals interpreted a preexisting condition clause that excluded coverage for a disability if, before the date of coverage, the insured obtained "any professional advice or treatment of a Physician, or any medical supply ... for that Disability;" or if "the Disability was manifest to the Covered Person." 267 Cal.Rptr. at 488. The court noted that its decision "depends on the precise language of the policy and not the general rule defining preexisting conditions in insurance contracts, which failed to [define the term]." *Id.* at 489.

The *Mogil* court observed that in cases involving policies that failed to define a "preexisting condition," a majority view had emerged that an " 'illness is deemed to have its inception when it first becomes manifest or active or when there is a distinct symptom or condition from which one learned in medicine can with reasonable accuracy diagnose the illness.' " *Id.* at 491 (quoting John C. Williams, Annotation, *Construction and Application of Provision in Health or Hospitalization Policy Excluding or Postponing Coverage of Illness Originating Prior to Issuance of Policy or Within Stated Time.*, 94 A.L.R.3d 990, 998 (1979), and collecting cases).

In *Mogil*, the policy excluded coverage for conditions that were "manifest to the Covered Person." *Mogil* held that this policy excluded coverage for a cancerous mole on the insured's shoulder where, before the policy took effect, the insured and her husband had noticed that the mole had grown and changed color, and had discussed seeking medical advice for it. 267 Cal.Rptr. at 494. That evidence showed the condition had been "manifest."[2] The provision in *Mogil* had been drafted to define preexisting conditions in terms of the majority common law rule requiring that the condition be "manifest." Most other cases cited by Principal Mutual involved either similar provisions for "manifest" conditions or the common law rule where the policy used no definition. *See Hannum v. General Life & Accident Ins. Co.*, 745 S.W.2d 500, 501 (Tex.App.1988) (common law rule applied where policy did not define term); *Preferred Risk Life Ins. Co. v. Sande*, 421 So.2d 566, 568 (Fla.App. 1982) (policy covered a "sickness first manifested while this policy is in force"); *Dirgo v. Associated Hospital Service, Inc.*, 210 N.W.2d 647, 650 (Iowa 1973) (applying common law rule); *McDaniel v. State Farm Mutual Ins. Co.*, 3 Kan.App.2d 174, 591 P.2d 1094, 1095 (1979) (policy covered any disease "first manifesting itself while this policy is in force").

**2.** *Mogil* did not discuss or apply the term in the policy excluding coverage if the insured had obtained professional advice or treatment "for that Disability," which is very similar to the clause at issue here.

These cases support the general proposition that a preexisting condition can be "manifest," and therefore excluded, before a precise and accurate diagnosis is made. These cases are not controlling here because the Principal Mutual policy in question does not use the "manifest" language in the relevant definition. This policy focuses instead on *treatment and service*. It very clearly provides coverage for even an illness that produces symptoms so long as the insured was not "confined" and did not "receive[ ] treatment or service" for that illness in the 90 days before the policy took effect. Accordingly, the majority common law rule that has been applied to policies without definitions, and the cases like *Mogil* applying policies that adopt the "manifest" language from that common law rule, do not apply to this case.

The "treatment or service" that Pitcher received before the policy took effect consisted of: (1) the routine examination on July 31, 1992, that detected lumps in both breasts, resulting in advice that she abstain from caffeine, (2) a return examination on September 15, 1992, prompted by the lumps, and (3) a mammogram of both breasts on September 15, 1992, that was also prompted by the lumps, but which would have been done whether the lumps were present or not. In terms of the Principal Mutual policy, the issue is whether that "treatment or service" was "for" fibrocystic breast disease or whether any of it was instead "for" breast cancer. If any of the treatment is deemed to have been "for" breast cancer, then Pitcher's cancer would be excluded from coverage.

Nothing in the Principal Mutual policy offers special guidance in determining when treatment or service is "for" one condition or another, at least in this factual context of combined conditions. The Court therefore turns to the scant case law involving similar preexisting condition clauses (focusing on treatment "for" a condition) as applied to combinations of conditions. The case most closely on point is *Hardester v. Lincoln National Life Ins. Co.,* 841 F.Supp. 714 (D.Md. 1994), but its status as precedent is not entirely clear. On August 24, 1994, a divided panel of the Fourth Circuit reversed the district court's judgment in *Hardester,* 33 F.3d 330 (4th Cir.1994), but on October 13, 1994, the Fourth Circuit granted rehearing *en banc* and vacated the panel's opinion. Because the facts are so similar, the case deserves close attention.

In *Hardester,* as here, the insured had a history of fibrocystic breast disease, and a routine physical revealed the existence of lumps in both breasts before the policy took effect. In *Hardester,* as here, the insured and her physician believed the lumps were merely signs of fibrocystic breast disease, but undertook some follow-up measures to be certain. In *Hardester,* the insured was examined again the same day the policy took effect. Her doctor recommended a mammogram. The mammogram was negative, but a week later the doctor removed a mole from the plaintiff's breast and recommended a biopsy of the mass in one breast. The biopsy showed the mass was malignant, and the plaintiff then had both surgery and chemotherapy.

The policy in *Hardester* defined a preexisting condition as "a Sickness or Bodily Injury for which You have received medical attention (care, treatment, services, medication, diagnosis or consultation) prior to" the effective date of the policy. The policy defined "sickness" as "a disturbance in the function or structure of Your body which causes physical signs and/or symptoms and which, if left untreated, will result in deterioration of the health state of the structure or system(s) of Your body." 841 F.Supp. at 716. In *Hardester,* the parties' arguments were essentially identical to those here, and on cross-motions for summary judgment, the district court ruled in favor of the insured.

The district court assumed that the insured actually had breast cancer before the policy took effect, but she had not "received any 'medical attention' for it. The cancer had not been diagnosed prior to [the effective date], and the care, treatment, service and consultation that plaintiff had received had only been for the fibrocystic disease." 841 F.Supp. at 716. The district court rejected the insurer's argument that the plaintiff had received medical attention for a mass in her breast (that contained both fibrocystic

changes and the cancer), and that the medical attention for the mass therefore amounted to medical attention "for" the cancer. *Id.*

The Fourth Circuit panel disagreed. As the majority viewed the case, the insured had received, care, treatment, services, and consultation "for or relating to the breast mass which a later biopsy revealed to have been malignant." 33 F.3d at 335. The majority also noted that it was concern about the possibility of cancer that led to the precautionary biopsy. *Id.* The majority found support for its reasoning in two cases that did not involve similar combinations of conditions, *Bullwinkel v. New England Mutual Life Ins. Co.*, 18 F.3d 429 (7th Cir.1994), which is discussed in detail below, and *Kirk v. Provident Life & Acc. Ins. Co.*, 942 F.2d 504 (8th Cir.1991), which involved a different type of preexisting condition clause and relied principally on Arkansas law construing such clauses.[3]

Judge Hall dissented from the panel decision in *Hardester*, focusing on the combination of conditions that was present there:

> Lacking evidence, the insurance companies resort to distortion of the record and of the district court's opinion. Their most pervasive gimmick is to absolutely ignore a fact undisputed in this record—the large ropey fibrocystic mass and the small carcinoma were merely, and luckily, coincident. From the very beginning of their brief's "Statement of the Case," the insurance companies refer to "the mass" as if a single condition were involved. Through this distortion, the companies are then able to make arguments that "the mass" had "caused physical signs or symptoms" and had received "medical attention" before the effective date of the policy. The companies have convinced the majority to look at the case this way, but they have not convinced me.

33 F.3d at 338 (Hall, J., dissenting). Judge Hall pointed out that there was "no causal or associative relationship between the fibrocystic tissue and carcinoma," and he argued that precautionary diagnostic tests should not be considered "treatments" for the conditions they are designed to test for, lest the law produce "a medical insurance system that covers only well persons and those sick persons who have not vigilantly monitored their health." 33 F.3d at 339 & n. 5. Judge Hall also pointed out that the Seventh Circuit's decision in *Bullwinkel* did not apply to cases (like Pitcher's) involving combinations of conditions: "Here, the cancer was discovered in the course of treating an unrelated manifest condition, while in *Bullwinkel* the only issue was whether the manifest condition was or was not malignant. In other words, the cancerous lump was discovered before the effective date in *Bullwinkel;* here, the cancerous lump was discovered after the effective date." *Id.*

The precedential status of *Hardester* is now uncertain because the Fourth Circuit has voted to rehear the case *en banc* and has vacated the panel opinion that reversed the district court decision. Nevertheless, this Court believes the analysis of the district court and the panel dissent in *Hardester* is persuasive because it focuses directly on the problem of determining whether a particular medical treatment or service was "for" one condition or another when two conditions exist simultaneously, but only one is known.

Another analogous case is *Ross v. Western Fidelity Ins. Co.*, 872 F.2d 665 (5th Cir.1989). In *Ross* a girl was born prematurely and had various symptoms reflecting heart and lung difficulties. Several tests were done the day she was born, including a two-dimensional echocardiogram. Those tests showed an enlarged right heart and a low blood oxygen level, but no heart murmur. Although some symptoms were consistent with a congenital heart defect, her doctor concluded at that

---

**3.** The policy in *Kirk* excluded coverage for "any Injury or Illness beginning before the effective date of the coverage." The insured had suffered from several symptoms before the policy took effect, but diagnostic tests for a bacterial infection of the heart were negative and the symptoms became much less severe. After the policy took effect, however, the symptoms returned and tests showed a bacterial infection that appeared to have been present all along. The Eighth Circuit majority held that the disease had therefore "begun" before the policy took effect. Judge Bright dissented, arguing the policy should have covered a condition that was not, and could not have been, accurately diagnosed until after the policy took effect. 942 F.2d at 507–08.

time that she had pulmonary hypertension, and that the tests "did not demonstrate any cardiac defect." 872 F.2d at 667. After she went home from the hospital, the girl's parents bought a health insurance policy. About six months later, the girl was taken to a doctor after she choked on her bottle and began coughing badly. At that time, the doctor detected a heart murmur and referred the girl again to the pediatric cardiologist who had seen her when she was born. This time the two-dimensional echocardiogram showed a hole between the left and right atria. That defect was corrected by heart surgery. The insurer refused to pay under a preexisting condition clause that excluded coverage for "a condition for which medical advice or treatment was recommended by or received from a physician within a five year period. ..." *Id.* at 668. The district court granted summary judgment for the insurer.

Applying Mississippi law, the Fifth Circuit reversed and held that the treatment the girl received when she was first born was not treatment "for" the heart defect. "Since the heart defect was not diagnosed during Jennifer's first week, the advice and treatment she received at that time could not have been *for that condition;* rather, pulmonary hypertension was the only condition diagnosed and treated at that time. Thus, the plain language of the clause leads to the conclusion that it does not exclude coverage of the heart defect." 872 F.2d at 669 (emphasis in original). On petition for rehearing, the Fifth Circuit clarified its holding:

> We should also make clear that our case only applied the specific language of the preexisting condition clauses of *this* policy in determining that summary judgment was inappropriate. Our holding is not to be interpreted to say that diagnosis is always required in order for the underlying condition to be treated, but there is at least a reasonable argument that, under the language of the second clause of the definition of preexisting conditions, treatment *for a specific condition* cannot be received unless the specific condition is known. One who has been treated for chicken pox has not necessarily been treated for small pox. Although arguments can be made that favor the insurer's interpre-

tation of the clause, the clause is, at best, ambiguous.

*Ross v. Western Fidelity Ins. Co.,* 881 F.2d 142, 144 (5th Cir.1989) (emphasis in original). In *Ross* it was clear that the heart defect had existed from birth and had produced symptoms before the policy took effect. The exclusion did not apply because, as a result of the combination of the pulmonary hypertension and the heart defect, the heart defect had not been detected, and the insured had received no prior treatment *for that condition. See also Casey v. Proprietors Life Assurance Co.,* 470 So.2d 339, 341 (La.App. 1985) (under similar preexisting condition clause, heart attack was not same illness for which plaintiff had been treated earlier where earlier symptoms were reasonably attributed to virus rather than heart condition); *Doe v. Northwestern National Life Ins. Co.,* 355 S.E.2d 867, 869 (S.C.App.1987) (under similar preexisting condition clause, earlier treatments for diabetes were not treatments "for" impotence, so treatment for impotence was not excluded).

This Court finds the reasoning of the district court and panel dissent in *Hardester,* with its uncannily similar facts, and the Fifth Circuit in *Ross* to be persuasive here. Because Pitcher's physical examination in July was routine and merely detected lumps that were treated as fibrocystic breast disease, that examination was not treatment or service "for" breast cancer. Similarly, the follow-up examination was not "for" the breast cancer, but was instead prompted by the apparent fibrocystic breast disease. The mammogram done the same day went a step farther, but it was done on both breasts, one that later turned out to have only fibrocystic breast disease, and one that had both fibrocystic breast disease and a carcinoma. In addition, the undisputed evidence is that, because of Pitcher's age, the mammogram would have been performed regardless of the presence or absence of detected lumps, and regardless of whether the cancer was present. Because Pitcher would have received all the treatments and services she received before the policy took effect regardless of whether the cancer was present, none of

those treatments or services were "for" the cancer.

Principal Mutual argues, however, that the Seventh Circuit's recent decision in *Bullwinkel v. New England Mutual Life Ins. Co.*, 18 F.3d 429 (7th Cir.1994), dictates the opposite result. In *Bullwinkel*, the health insurance policy took effect on July 31, 1991. Earlier in July, the insured had noticed a lump in one breast. On July 20, her physician performed an ultrasound examination and detected what he thought was a cyst. He did not make a definitive diagnosis. While he assured the patient that it was more likely benign than cancerous, he referred her to a surgeon for removal and biopsy of the cyst, telling her, "Let's be safe and take it out." 18 F.3d at 430. The insured visited a surgeon after the policy took effect, and the lump was surgically removed. Tests then showed that the lump was cancerous, and she had additional surgery, as well as radiation and chemotherapy.

The insurance policy in *Bullwinkel* excluded coverage for "a condition, sickness, or injury for which you or your dependent were seen, treated, diagnosed, or incurred medical expense in the six-month period just before insurance starts...." *Id.* The insurer in *Bullwinkel* argued that because the lump turned out to be cancerous, the medical examination of the lump in July "was actually treatment for cancer," so that the cancer was an excluded preexisting condition. 18 F.3d at 431. The Seventh Circuit accepted this argument:

> Is a malignant breast lump—discovered before the effective date of an insurance policy but not definitely diagnosed as cancer until after coverage commenced—a "condition, sickness, or injury" for which [the insured] was "seen, treated, diagnosed, or incurred medical expenses" in July? Certainly, a malignant breast tumor is a "condition" and a "sickness." True, [the insured] was never "seen, treated, diagnosed" specifically for breast cancer in July, nor did she incur medical expenses specifically for breast cancer in July. But she was "seen, treated, diagnosed" and she did incur medical expenses for a breast lump in July. The lump was discovered in

September to be cancerous. We may infer from this fact that the lump was also cancerous in July. *So, even though [the insured] did not know the lump was cancerous in July, her visit with the doctor in that month concerning the lump actually concerned cancer. It follows that [the insured] was "seen" and "treated" and incurred medical expenses for her cancer in July.* Therefore, any post-policy treatment concerning the same condition is not covered.

18 F.3d at 432 (emphasis added). The Seventh Circuit went on to limit the scope of the decision:

> Obviously, this case is not an authorization for summary judgment in all future cases dealing with pre-existing conditions limitations. Several attributes make this case unique. First, the lump discovered in July was not a trivial and inconclusive symptom. *See Kirk [v. Provident Life & Acc. Ins. Co.*, 942 F.2d 504, 506 (8th Cir. 1991)]. Consider the hypothetical where a person purchased cough medicine in one month, then obtained insurance, only to learn in the next month that he had lung cancer, which possibly caused his hacking. A district court would not be able to conclusively determine whether treatment for the cough was actually treatment for the cancer, without the benefit of an evidentiary hearing.

18 F.3d at 433.

Although *Bullwinkel* also dealt with the process of diagnosing breast cancer, there is a critical factual difference between the present case and *Bullwinkel*. In this case, unlike *Bullwinkel*, plaintiff Pitcher had a long history of fibrocystic breast disease. When lumps appeared in both breasts in July 1992, both she and her doctor thought the lumps were manifestations of fibrocystic breast disease. As in *Hardester* and *Ross*, this case involves a combination of two different conditions. On this record, it is clear that Pitcher would have received all the services she received before the policy took effect—the routine examination, the follow-up examination, and the mammogram—regardless of whether she had breast cancer. The treatment and service that Pitcher received before the effective

date of the policy therefore were not "for" what turned out to be breast cancer. In *Bullwinkel,* by comparison, there was no other condition present. Once the cancer was diagnosed, it became clear that the condition that had been the subject of treatment was the cancer, and *only* the cancer. As the Seventh Circuit said, "her visit with the doctor ... actually concerned cancer." 18 F.3d at 432. That was not the case here, so the reasoning of *Bullwinkel* does not apply to this combination of conditions. *See also Hardester,* 33 F.3d at 339 (Hall, J., dissenting) (distinguishing *Bullwinkel* from situation where cancer was discovered "in the course of treating an unrelated manifest condition").

Essentially the same analysis applies to two other cases cited by Principal Mutual. In *Cury v. Colonial Life Ins. Co.,* 737 F.Supp. 847 (E.D.Pa.1990), the insured was diagnosed with multiple sclerosis after a disability insurance policy took effect. The policy defined preexisting condition as "a sickness or injury for which you [a] received medical treatment or consultation; [b] had medical care or service(s); [c] had diagnostic tests(s); or [d] took prescribed drug(s) or medicine(s)" during the specified period. 737 F.Supp. at 849. The evidence showed that the insured had shown symptoms of multiple sclerosis and had consulted doctors during the relevant period. The court held that these services had been "for" the multiple sclerosis even though the disease had not yet been diagnosed. *Id.* at 854–56. As in *Bullwinkel,* because the insured in *Cury* had no other condition that could account for the symptoms, the later diagnosis confirmed that the earlier services had been "for" the multiple sclerosis.

In *Fischman v. Blue Cross & Blue Shield of Connecticut, Inc.,* 775 F.Supp. 513 (D.Conn.1991), the issue under the policy was whether the insured had received medical advice regarding a condition that was diagnosed later as rectal cancer. During the relevant period, the insured had shown symptoms of cancer and his doctor had recommended a colonoscopy. The court concluded that this had been medical advice regarding the cancer, even though the cancer had not yet been diagnosed. 775 F.Supp. at 516–17. Again, as in *Bullwinkel* and *Cury,* and unlike this case, the insured in *Fischman* had no other condition that accounted for the symptoms. That analysis does not control in this case because of Pitcher's combination of conditions.[4]

This Court does not hold that Principal Mutual's preexisting condition clause applies only to conditions that have been definitively diagnosed. As Principal Mutual points out, *Bullwinkel, Cury, Fischman,* and many other cases have rejected arguments that a disease must be diagnosed accurately before it is covered by various forms of preexisting condition clauses. Some of those courts have expressed concern about doctors and patients deliberately delaying diagnosis of obviously serious conditions until after a policy takes effect. That sort of behavior would plainly allow serious and costly distortion of the distribution of risks, as well as dangerous delays in treatment. *See, e.g., Fischman,* 775 F.Supp. at 516. That concern appears to have been present in *Bullwinkel,* also. However, in the factual context of this case, with the *combination* of conditions—one treated before the policy took effect and the other treated after the policy took effect—that con-

---

4. Principal Mutual also relies on *Eley v. Boeing Co.,* 945 F.2d 276 (9th Cir.1991), in which the insured had a "Pap" test before her insurance took effect. The test produced a "Class II-atypical finding," which indicates that an abnormality such as cervical cancer may be present. After the policy took effect, the insured had a biopsy which showed cancer to be present. The insured denied coverage for the cancer treatments, and Ninth Circuit affirmed summary judgment in favor of the insurer. *Eley* offers little guidance here for two reasons. First, the plan in *Eley* gave the insurer discretion to determine eligibility for benefits, so the courts applied the "abuse

of discretion" standard in reviewing the denial of benefits rather than the *de novo* standard that applies here. *See* 945 F.2d at 278. Second, the policy in *Eley* defined preexisting condition as "an illness ... whether or not diagnosed, for which a person has received medical treatment, consultation, a diagnostic test or prescribed medicines" during the relevant time. The reference to "a diagnostic test" was much more specific than the definition in Principal Mutual's policy, and the Ninth Circuit held that a layperson would reasonably consider a Pap test to be a "diagnostic test" under the policy in *Eley.* 945 F.2d at 279.

cern about deliberately delayed diagnosis simply is not relevant.

■ For these reasons, the Court holds that, under the governing language in the Principal Mutual policy, Pitcher received no treatment or services "for" the breast cancer before the policy took effect. However, there is also another, independent basis for the Court's decision on the merits. That basis is suggested by the disagreements among the judges in *Hardester* and by the rehearing opinion in *Ross*. In developing the federal common of law of contracts to interpret contracts subject to ERISA, the Seventh Circuit has strongly endorsed the rule that ambiguities in insurance contracts are resolved in favor of the insured. *Phillips v. Lincoln National Life Ins. Co.*, 978 F.2d 302, 308–14 (7th Cir.1992). *Phillips* makes clear that courts must interpret the terms of an ERISA policy in an ordinary and popular sense as would a person of average intelligence and experience. 978 F.2d at 308 (citing *Hammond v. Fidelity & Guaranty Life Ins. Co.*, 965 F.2d at 430). *Accord, McNeilly v. Bankers United Life Assur. Co.*, 999 F.2d 1199, 1201 (7th Cir.1993).

In *Phillips* the Seventh Circuit explained in detail its reasons for following the rule of *contra proferentem*—construing ambiguities against those who drafted them—in this ERISA context:

> *Insurance policies are almost always drafted by specialists employed by the insurer. In light of the drafters' expertise and experience, the insurer should be expected to set forth any limitations on its liability clearly enough for a common layperson to understand; if it fails to do this, it should not be allowed to take advantage of the very ambiguities that it could have prevented with greater diligence.* Moreover, once the policy language has been drafted, it is not usually subject to amendment by the insured, even if he sees an ambiguity; an insurer's practice of forcing the insured to guess and hope regarding the scope of coverage requires that any doubts be resolved in favor of the party

who has been placed in such a predicament.

978 F.2d at 312 (quoting and adding emphasis to *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 540 (9th Cir.1990)). And predicament it is when the question arises only after the insurance has been paid for and the loss has been incurred, and the insured then turns to the insurer to cover the loss.

■ Under *Phillips* and the other Seventh Circuit cases dealing with ambiguities in ERISA policies, the issue here may be stated as whether a person of average intelligence and experience, reading the definition of preexisting condition in the Principal Mutual policy, should conclude that Pitcher's routine physical examination on July 31, her follow-up exam, and mammogram on September 15 were "for" breast cancer or "for" fibrocystic breast disease.[5] The preposition "for" in the Principal Mutual policy focuses the inquiry on the purpose of the treatment or service. This common (and ordinarily clear) English word does not, however, tell insureds, their doctors, or Principal Mutual how they should apply the clause to combinations of conditions like Pitcher's situation here.

The problem in both *Hardester* and in this case is how to apply the policy language on treatment or service "for" a particular condition when the routine treatment "for" another condition includes tests to exclude the possibility of the second condition. Are the tests "for" the first condition or "for" the second condition? The policy does not provide any guidance on the issue. This record does not show any medical or causal link between Pitcher's fibrocystic breast disease and her breast cancer. In fact, the record shows quite clearly that Pitcher would have received all the services she received before the policy took effect—the routine examination, the follow-up examination, and the mammogram—*regardless of whether she had breast cancer*. As a result, this Court believes it is clear that these treatments and services were not "for" the breast cancer.

---

**5.** The original routine examination appears to have been "for" neither condition. On this record, it was merely a routine physical examination directed toward Pitcher's overall health, and was not "for" any particular condition.

The fact that the parties disagree does not prove, of course, that the policy is ambiguous. But the disagreements among the district court and panel members in *Hardester* and the clarifying opinion in *Ross* show that there is room for reasonable argument about how to apply the policy phrase "for which a person was confined or received treatment or service" to this *combination* of conditions. Thus, even if this Court is wrong about the correct application of the phrase to these facts, the phrase would still be ambiguous as applied to these facts. *See McNeilly v. Bankers United Life Assur. Co.*, 999 F.2d at 1201 (under ERISA, if an exception in health insurance policy "does not unambiguously encompass a particular set of facts, it cannot be invoked to deny coverage in that instance"; term "employment" held ambiguous as applied to insured's maintenance work on apartment building he owned); *Wood v. Allstate Ins. Co.*, 21 F.3d 741, 744 (7th Cir.1994) (term "date of loss" held ambiguous as applied to context of fire that started one day and was extinguished the next). In terms of *McNeilly*, Principal Mutual's preexisting condition clause "does not unambiguously encompass" this set of facts, where Pitcher had another unrelated and manifest condition, and would have received all the same treatments and services before the policy took effect, regardless of whether she had cancer.

▆ In theory, it might be possible for the parties to resolve this ambiguity by offering extrinsic evidence about their intentions. After all, the rule of *contra proferentem* is a "tie-breaker" when there is no other sound basis for choosing one contract interpretation over another. *Residential Marketing Group, Inc. v. Granite Investment Group*, 933 F.2d 546, 548 (7th Cir.1991) (applying Illinois law). However, there is no suggestion that the terms of this contract were ever negotiated or that the parties expressed themselves to one another (at a relevant time) on any subject relevant to applying the clause to this factual setting. Neither party offers any admissible evidence in an effort to raise a genuine issue of fact. *See Ryan v. Chromalloy American Corp.*, 877 F.2d 598, 603 (7th Cir.1989) (cross-movant for summary judgment not relieved of obligation to present any evidence showing a genuine issue of material fact existed). Under these circumstances, the rule of *contra proferentem* therefore governs, and the ambiguity of the policy as applied to these facts requires that the contract be construed in favor of the insured.[6]

In summary, then, the issues in this case must be decided based on the specific preexisting condition clause in this insurance policy, and not on the basis of precedents involving substantially different policies. Under the governing contractual language, the focus must be on the "treatment or service" that Pitcher received in the 90 days before her policy took effect. In view of her history of fibrocystic breast disease, this Court cannot conclude that her routine physical examination in July, her follow-up examination, or her mammogram on September 15, 1992, were "for" the breast cancer. The services were either routine screens or were "for" the fibrocystic breast disease. In the alternative, to the extent there is reasonable room for argument about the application of the clause to these facts, that room for disagreement shows that the clause is ambiguous as applied to these facts. Under the rule of *contra proferentem* endorsed in *Phillips* and other Seventh Circuit cases, the ambiguity must be construed in favor of Pitcher and against Principal Mutual. Because those treatments and services were not "for" the

---

6. In support of her motion for summary judgment, Pitcher has submitted an affidavit from her primary care physician, Dr. Harold Manifold, and a letter from the radiologist, Dr. Jonathan Stafford. Dr. Stafford's letter to Principal Mutual argued in favor of covering Pitcher's cancer. Dr. Stafford's letter is inadmissible hearsay. Dr. Manifold's affidavit says he agrees with Dr. Stafford "that an abnormal result from a mammogram is not a diagnosis of cancer, and that cancer cannot be diagnosed until the tissue is viewed under a microscope after a biopsy.

Therefore, it is my opinion that Ms. Pitcher's cancer was not diagnosed, and she did not receive treatment for it, until the date of the biopsy, September 18, 1992." Citing *Cury v. Colonial Life Ins. Co.*, 737 F.Supp. at 854, Principal Mutual argues that Dr. Manifold's attempt to interpret the language of the contract ("my opinion ... she did not receive treatment for [the cancer]") is inadmissible as opinion testimony on the meaning of a contract. The Court has disregarded Dr. Manifold's opinion on the contract, but has considered the remainder of his affidavit.

breast cancer, Pitcher is entitled to summary judgment on liability.

### Damages and Attorneys' Fees

■ Pitcher's motion for summary judgment asks the Court to enter judgment against defendant for $24,260.42, plus pre-judgment interest, costs, and attorneys fees. Pitcher says that her claims for benefits total $24,260.42, and she supports this figure with an affidavit from her attorney to authenticate the copies of the bills submitted with her motion. Principal Mutual objects that the attorney does not have personal knowledge of these matters and that the attorney's affidavit is therefore not admissible to establish the amounts of these bills. Pitcher responds that there is no genuine dispute over the amount of the bills and that Principal Mutual's arguments are "an exaltation of form over substance." Pitcher also suggests that the bills might be admissible as business records or pursuant to the catch-all exception in Fed.R.Evid. 803(24).

Principal Mutual's arguments on this point are well-taken. Pitcher's counsel's affidavit does not establish the personal knowledge needed to authenticate the medical bills and to make them admissible as business records. While Principal Mutual has not come forward with evidence showing a genuine issue of material fact concerning the bills, Principal Mutual did not need to come forward with such evidence unless and until Pitcher properly supported her motion for summary judgment on this point with admissible evidence showing that there was no genuine issue of fact on these matters. Because the attorney's affidavit is not admissible to establish the amounts of the medical bills, Pitcher has failed to support her motion for summary judgment with evidence showing there is no genuine issue of material fact as to the amount of her damages. Therefore, summary judgment is granted to Pitcher only on the issue of liability.

■ Pitcher has also requested an award of attorneys fees. Under ERISA, the court has discretion to award attorneys fees to a prevailing plaintiff. 29 U.S.C. § 1132(g). The Seventh Circuit has instructed district courts to apply a five-factor test in deciding whether to award fees to plaintiffs who prevail under ERISA. *Janowski v. International Brotherhood of Teamsters Local 710*, 673 F.2d 931, 940 (7th Cir.1982), *vacated on other grounds*, 463 U.S. 1222, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983). The five factors are:

(1) the degree of the offending parties' culpability or bad faith; (2) the degree of the ability of the offending parties to satisfy personally an award of attorneys' fees; (3) whether or not an award of attorneys' fees against the offending parties would deter other persons acting under similar circumstances; (4) the amount of benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' positions.

*Janowski*, 673 F.2d at 940. Although the *Janowski* factors were developed for cases involving pension plans (where a prevailing beneficiary's fees may be awarded at the direct expense of other plan beneficiaries), the Seventh Circuit has also applied those factors where a plaintiff prevails against an insurer on a claim for health insurance benefits. *Rivera v. Benefit Trust Life Ins. Co.*, 921 F.2d 692, 698 (7th Cir.1991).

The first factor does not weigh in favor of a fee award here, for there is no indication of bad faith on the part of Principal Mutual. This Court disagrees with its application of the policy language to this factual situation, but reasonable people could disagree. The Court is troubled, however, by the fact that Principal Mutual devoted so much of its argument to efforts to apply the "manifest" standard, which quite plainly has no application at all under the terms of this policy. The second factor weighs in favor of a fee award, for the defendant should be able to afford the fee award here.

The third factor also weighs in favor of a fee award, for there is a deterrent value to allowing fees where an insurer erroneously denies coverage. This factor is especially important where coverage is flatly denied in the health insurance context. People buy insurance for peace of mind, as well as reimbursement of expenses. The erroneous and complete denial of coverage denies the insured the benefit of peace of mind and forces her to incur substantial additional costs, thus

denying her much of the "benefit of the bargain."

The fourth *Janowski* factor is focused on pension plans, but Pitcher's suit seems to provide some benefit to other insureds by enforcing the terms of the policy. While her suit could conceivably result in higher premiums in the long run (or perhaps in a modification of the policy), adherence to the policy should benefit other insureds. Thus, the fourth factor also weighs in favor of a fee award. The fifth *Janowski* factor does not weigh heavily either way. Principal Mutual's position is not frivolous, but it has invoked the preexisting condition clause in a situation where it does not clearly apply and where, because of the undisputed facts concerning the timing of Pitcher's employment and the delayed effective date of her insurance, application of the clause would not serve its purpose of preventing fraud. On balance, therefore, after considering each of these factors, this Court believes it should exercise its discretion to allow a fee award here.

However, the materials submitted in support of Pitcher's motion for summary judgment are not sufficient for the Court to determine that the amount of damages or the amount of an appropriate fee award is beyond genuine dispute. As Pitcher points out, in most cases the amounts of medical bills are ordinarily resolved by stipulation. Similarly, while more specific supporting materials should be provided to support a fee petition, the amount of attorneys fees suggested in Pitcher's summary judgment materials appears quite reasonable. The Court will therefore set a pretrial conference in the near future, and the parties shall confer before that conference on possible stipulations on damage issues, including both medical expenses, attorneys fees, and prejudgment interest. If necessary, the matter will be set for trial on those issues.